963 So.2d 189 (2007)
HEART OF ADOPTIONS, INC., Petitioner,
v.
J.A., Respondent.
No. SC07-738.
Supreme Court of Florida.
July 12, 2007.
*190 Jeanne T. Tate, Tampa, FL and Raymond R. Elligett, Jr. of Schropp, Buell and Elligett, P.A., Tampa, FL, for Petitioner.
Rhonda Raulerson Portwood, Inverness, FL, for Respondent.
*191 Susan Lee Stockham, Sarasota, FL, and Allison M. Perry, Tampa, FL, on behalf of the Concerned United Birthparents; Amy U. Hickman of Hausmann and Hickman, P.A., Boynton Beach, FL, and John G. Crabtree, Key Biscayne, FL, on behalf of the Family Law Section of the Florida Bar; and Patricia L. Strowbridge, Orlando, FL, on behalf of the Florida Adoption Council, Inc., as Amicus Curiae.
PARIENTE, J.
We have for review J.A. v. Heart of Adoptions, Inc. (In re Baby H), ___ So.2d ___, 32 Fla. L. Weekly D807, 2007 WL 914676 (Fla. 2d DCA Mar. 28, 2007), in which the Second District Court of Appeal certified the following question as a matter of great public importance:
IN A PROCEEDING ON A PETITION FOR TERMINATION OF PARENTAL RIGHTS PENDING ADOPTION, MAY THE UNMARRIED BIOLOGICAL FATHER'S RIGHTS IN RELATION TO THE CHILD BE TERMINATED BASED ON THE UNMARRIED BIOLOGICAL FATHER'S FAILURE TO PROPERLY FILE A CLAIM OF PATERNITY WITH THE FLORIDA PUTATIVE FATHER REGISTRY?[[1]]
We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We answer the question based on the facts before us in this case and our interpretation of the applicable statutory provisions. We hold that the rights of an unmarried biological father in relation to the child, who is known or identified by the mother as the potential father and who is locatable by diligent search, may be terminated based on his failure to file a claim with the Florida Putative Father Registry only if the father was served with notice under section 63.062(3)(a), Florida Statutes (2005), and he fails to comply with the requirements of that subsection within the thirty-day period. By construing the statute in this manner, we avoid ruling on any potential constitutional implications of the statutory scheme either facially or as applied under these circumstances.

FACTS AND PROCEDURAL HISTORY
J.A., the alleged biological father of Baby H, became aware of the birth mother's pregnancy approximately three months prior to the birth of Baby H.[2] On July 21, 2005, approximately two weeks prior to the birth, the adoption agency Heart of Adoptions, Inc. (HOA), sent J.A. a certified letter, which J.A. received, requesting that he contact the adoption agency with regard to a "legal matter involving [the mother] and her pregnancy." This letter also indicated that the adoption disclosure statement required under section 63.085, Florida Statutes (2005), was enclosed, and requested that J.A. sign and return an acknowledgement of receipt of the disclosure.
*192 On August 1, 2005, four days before the birth, HOA sent J.A. a more detailed letter, which J.A. also received. This letter purported to confirm a conversation between J.A. and an adoption social worker employed by HOA during which J.A. was informed that the birth mother had contacted the agency, planned to place the baby for adoption, and had indicated that J.A. was the possible biological father of the baby. The letter informed J.A. that if he decided to cooperate with the birth mother's adoption plans, she would like to involve him in the process. The letter also contained the following statements and information:
If you choose not to consent to the adoption because it is your desire that the child not be placed for adoption, under Florida law your failure to provide support for the birth mother during her pregnancy and for the child after birth may be used to establish your abandonment of the child.
[Birth mother] is in need of financial assistance now. Therefore, if you desire to establish and/or protect your rights, you should contact an attorney immediately and send living expense monies for [birth mother]. Please direct the living expenses to the agency so the agency can verify receipt. Her monthly needs are as follows: rent $800; rental deposit $800; utilities $200 electric deposit and $50 water deposit. She also needs clothing at a cost of $250. Additionally, she may have incidental medical expenses that are not covered by Medicaid.
The letter did not inform J.A. that in order to preserve his right to notice of and consent to the adoption, he must timely file a claim of paternity with the Florida Putative Father Registry (Registry).
On August 5, 2005, Baby H was born in Citrus County, Florida. That same day, with the assistance of a non-lawyer utilizing Florida Supreme Court Approved Family Law Forms, J.A. filed a petition to determine paternity and for related relief in the Fifth Judicial Circuit Court in Citrus County. The petition requested that the court "stop the mother from allowing the child to be adopted." According to the financial affidavit filed along with the paternity petition, J.A.'s monthly net income was $1300.
The following day, the birth mother executed a consent to adoption and placed the baby with HOA. The birth mother also executed an affidavit of inquiry regarding the biological father. In this affidavit, she stated that she was engaged to a man, who was not the child's biological father, and identified J.A. as the biological father. She provided J.A.'s address and made the following statements regarding J.A.:
9. . . . .
(2) [He] has been informed of my pregnancy and adoption plan but has not paid a fair and reasonable amount of the expense incurred in connection with the pregnancy, in accordance with his financial ability. In fact, the biological father contributed no monies to me or this child or on our behalf;
. . . .
(4) [He] did not provide or promise to provide the child or me during the pregnancy with support in a repetitive customary manner.
10. The biological father, [J.A.], is over the age of eighteen and is employed. I believe he has sufficient resources so that he could have provided some financial support to me during the pregnancy, if he so wished.
11. The biological father is aware that I reside in and can be located in the State of Florida. At all times during the pregnancy, he has known how to communicate with me.

*193 12. Because of my limited resources, I have had to rely on assistance from the prospective adoptive parents, my mother and the State of Florida in order to provide for myself during the pregnancy.
On August 8, 2005, which was three days after the birth and three days after the petition to determine paternity had been filed, HOA filed a petition for termination of parental rights against J.A. in the Thirteenth Judicial Circuit in Hillsborough County.[3] The petition identified J.A. as the biological father, provided his address, and repeated the birth mother's statements in her affidavit that J.A. had not provided or attempted to provide the child or the mother with support during her pregnancy. The petition also stated that although J.A. was able, he refused to provide financial support after he was informed he might be the father of the child. In addition, the petition alleged physical and financial abandonment of the birth mother and child pursuant to sections 63.089, 63.064(1) and 63.032(1), Florida Statutes (2005).
The petition also alleged the following: that J.A.'s consent to the adoption was not required or should be considered waived; that J.A. was not entitled to notice of the petition; and that J.A. was not entitled to object to the termination of his parental rights because he did not qualify as a person required to consent to an adoption under any of the criteria listed in section 63.062(1), Florida Statutes (2005). Specifically, the petition alleged that his consent was not required because J.A. failed to file a claim of paternity form with the Registry and comply with the additional requirements of section 63.062(2), Florida Statutes (2005). However, the petition acknowledged that J.A. received the adoption disclosure, which an adoption entity is required to send to the "parent who did not initiate the contact with the adoption entity," and which must state that "[a] putative father may sign a valid consent for adoption at any time after the birth of the child." § 63.085(1), Fla. Stat. (2005). "Parent" is defined in pertinent part as "a man whose consent to the adoption of the child would be required under s. 63.062(1)." § 39.01(49), Fla. Stat. (2005).[4]
Further, HOA served J.A. with a summons, notice of petition, and notice of hearing to terminate parental rights pending adoption.[5] The summons informed J.A. that he was "required to serve written defenses to the . . . petition." The notice of petition and notice of hearing, which were in the form prescribed by section 63.088(3), Florida Statutes (2005), informed J.A. of the date and time of the hearing on the petition to terminate his parental rights and contained the following warning:
UNDER SECTION 63.089, FLORIDA STATUTES, FAILURE TO FILE A WRITTEN RESPONSE TO THIS NOTICE WITH THE COURT OR TO APPEAR AT THIS HEARING CONSTITUTES GROUNDS UPON WHICH THE COURT SHALL END ANY PARENTAL *194 RIGHTS YOU MAY HAVE REGARDING THE MINOR CHILD.
On August 17, 2005, HOA filed a notice of related action in the Thirteenth Circuit, which alerted the trial court to the paternity action filed by J.A. in Citrus County. On September 2, 2005, J.A. filed a response to the petition for termination of parental rights, in which he denied all of the allegations. On September 26, 2005, he filed a motion requesting that the court take judicial notice of his pending paternity action.
A hearing on the petition to terminate J.A.'s parental rights was held on September 27, 2005. There is no transcript of the hearing because no court reporter was present. However, the parties stipulated to a number of facts, including that J.A. did not file a claim of paternity with the Registry or execute an affidavit stating he was able and willing to take responsibility for the child, setting forth his plans to care for the child, and agreeing to a court order of support and contribution to the mother's expenses incurred during the pregnancy in accordance with his ability to pay.
J.A. stipulated that he was aware of the birth mother's pregnancy approximately three months prior to the delivery, was aware of the adoption plan at least three weeks prior to the birth, and was contacted by the adoption agency in writing at least two times prior to the birth. The stipulated facts further stated that although J.A. "was never presented as a witness nor sworn in as one," he stated that he did not know about the Registry. Counsel for J.A. asserted that under section 63.062(3)(a), Florida Statutes (2005), HOA was required to notify J.A. of the Registry.
The trial court rejected the argument that section 63.062(3)(a) required mandatory notice. The trial court found that J.A.'s consent to the termination of his parental rights or to the adoption was not required because he did not file a claim of paternity with the Registry or execute the affidavit stating, among other things, that he was able and willing to take responsibility for the child. The trial court also determined that J.A.'s pending paternity action did not affect the trial court's ability to terminate his parental rights without his consent. The trial court did not rule on the mother's allegations that J.A., by his actions, had physically abandoned her and the child.
The trial court issued a final order terminating the parental rights of J.A. and J.A. sought review in the Second District Court of Appeal. The Second District court reversed the judgment of termination and remanded on the basis of its prior decisions in J.C.J. v. Heart of Adoptions, Inc. (In re Baby R.P.S.), 942 So.2d 906 (Fla. 2d DCA 2006), and A.S. v. Gift of Life Adoptions, Inc. (In re Baby A.), 944 So.2d 380 (Fla. 2d DCA 2006). In each of those decisions, the Second District held that in ruling on a petition for termination pending adoption, the trial court was without authority to terminate the parental rights of an alleged unmarried biological father who failed to register with the Registry because he was not a "parent" as defined in the statutory scheme. The Second District further held that when a paternity action is pending at the time a petition for termination is filed, the paternity action should proceed prior to the conclusion of the petition for termination. The Second District also certified the question of great public importance set forth above.

ANALYSIS
The question presented by the Second District involves an issue of statutory interpretation subject to de novo review. See Foundation Health v. Westside EKG Assocs., 944 So.2d 188, 193-94 (Fla.2006). *195 Specifically, we must determine whether the statutory scheme vests the trial court with authority to terminate the parental rights of an alleged unmarried biological father who does not come within the categories of persons required to consent to adoption under section 63.062. Within this broad question, we necessarily decide under what circumstances the Legislature has required that the adoption entity serve notice on the unmarried biological father of the steps he must take to preserve his ability to either consent or withhold his consent to an adoption.
In analyzing the issue we first set forth the applicable statutory provisions. We then apply well-settled principles of statutory construction to determine whether and under what circumstances the rights of an unmarried biological father in relation to the child can be terminated without his consent based on his failure to file a claim with the Registry. Finally, we discuss the application of our statutory construction to the facts of this case.

I. The Statutory Scheme
The Florida Adoption Act, codified in chapter 63, Florida Statutes, is a comprehensive statutory scheme intended to provide a mechanism "to protect and promote the well-being of persons being adopted and their birth and adoptive parents and to provide to all children who can benefit by it a permanent family life." § 63.022(3), Fla. Stat. (2005). The most prevalent theme in the discussion of legislative intent is that of permanence, stability, and finality with regard to adoptive placements, all very important factors in the life of a child. Section 63.022(1)(a), Florida Statutes (2005), provides: "The state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." Similarly, other provisions of section 63.022 address the right of an unmarried mother to "assurance regarding an adoptive placement," the right of adoptive children "to permanence and stability in adoptive placements," and the right of adoptive parents "in retaining custody of a legally adopted child." § 63.022(1)(b)-(d), Fla. Stat. (2005).
As to the father of the child, section 63.062, Florida Statutes (2005), provides that a father's written consent is required in specific circumstances, including if the child was born or conceived when the father and mother were married. § 63.062(1)(b)(1), Fla. Stat. (2005). However, the issues presented by this case involve unmarried biological fathers. As to this class of fathers, the Legislature found:
An unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during the pregnancy and after the child's birth. The state has a compelling interest in requiring an unmarried biological father to demonstrate that commitment by providing appropriate medical care and financial support and by establishing legal paternity rights in accordance with the requirements of this chapter.
§ 63.022(1)(e), Fla. Stat. (2005).
With respect to the waiver and surrender of the rights of unmarried biological fathers, further legislative findings are contained in section 63.053(2), Florida Statutes (2005):
The Legislature finds that the interests of the state, the mother, the child, and the adoptive parents described in this chapter outweigh the interest of an unmarried biological father who does not take action in a timely manner to establish *196 and demonstrate a relationship with his child in accordance with the requirements of this chapter.
Accordingly, the Legislature prescribed the actions that an unmarried biological father must take to establish his right to notice of and consent to an adoption. §§ 63.054, 63.062(2), Fla. Stat. (2005).
A central feature of the Florida Adoption Act is the Florida Putative Father Registry. Section 63.054 establishes the Registry and provides that an unmarried biological father must timely file a claim of paternity with the Registry in order to preserve his right to notice of and consent to an adoption. § 63.054(1), Fla. Stat. (2005). The claim of paternity is considered untimely if filed after either the date a petition for termination of parental rights is filed, see id., or the date the mother executes her consent for adoption. See § 63.062(2)(b)(1), Fla. Stat. (2005).
Section 63.062(2) sets forth additional requirements with which an unmarried biological father must comply in order to preserve his right to notice of and consent to an adoption. With regard to a child who is younger than six months of age at the time the child is placed with the adoptive parents, in addition to filing a claim with the Registry, the father must, on service of a notice of an intended adoption plan or a petition for termination of parental rights pending adoption,
execute[] and file[] an affidavit in that proceeding stating that he is personally fully able and willing to take responsibility for the child, setting forth his plans for care of the child, and agreeing to a court order of child support and a contribution to the payment of living and medical expenses incurred for the mother's pregnancy and the child's birth in accordance with his ability to pay.
§ 63.062(2)(b)(2), Fla. Stat. (2005). Further, if he knew about the pregnancy, the father must have "paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability and when not prevented from doing so by the birth mother or person or authorized agency having lawful custody of the child." § 63.062(2)(b)(3), Fla. Stat. (2005). Section 63.062(2)(d), Florida Statutes (2005), provides that an unmarried biological father, who does not comply with each of the conditions in the subsection, "is deemed to have waived and surrendered any rights in relation to the child."
Section 63.062(3)(a) relates to notice of the intended adoption plan to the unmarried biological father and provides that an adoption agency
may serve upon any unmarried biological father identified by the mother or identified by a diligent search of the Florida Putative Father Registry, or upon an entity whose consent is required, a notice of intended adoption plan at any time prior to the placement of the child in the adoptive home, including prior to the birth of the child.
The notice of adoption plan, when served, "shall notify the unmarried biological father that he must file a claim of paternity form with the Office of Vital Statistics within 30 days after service upon him" and "must include instructions as to the procedure the unmarried biological father must follow to submit a claim of paternity form to the Office of Vital Statistics and the address to which the registration must be directed." § 63.062(3)(a), Fla. Stat. Further, the notice of intended adoption plan served on the unmarried biological father "must specifically state that if the unmarried biological father desires to contest the adoption plan, he must file with the court, within 30 days after service, a verified response that contains a pledge of commitment *197 to the child in substantial compliance with subparagraph (2)(b)2." Id.
By filing a claim of paternity with the Registry, an unmarried biological father can request DNA testing. See § 63.054(2), Fla. Stat. (2005). Chapter 742 of the Florida Statutes also relates to the determination of parentage. Section 742.10(1), Florida Statutes (2005), states that "[t]his chapter provides the primary jurisdiction and procedures for the determination of paternity for children born out of wedlock." Section 742.011, Florida Statutes (2005), provides:
Any woman who is pregnant or has a child, any man who has reason to believe that he is the father of a child, or any child may bring proceedings in the circuit court, in chancery, to determine the paternity of the child when paternity has not been established by law or otherwise.
Therefore, under chapter 742, the Legislature has provided the means for an unmarried biological father to determine his paternity of a child.
We reject the Second District's holding that an unmarried biological father's failure to timely file with the Registry cannot provide a basis for terminating that father's parental rights. Although we recognize the extensive statutory construction analysis engaged in by the Second District in its previous decision in A.S., we conclude that the Second District disregarded the clear intent of the Legislature in section 63.062(2)(d) that an unmarried biological father who does not comply with the requirements of section 63.062(2) is "deemed to have waived and surrendered any rights in relation to the child." The entire statutory scheme would be frustrated, including the interest in prompt adoption proceedings, if an unmarried biological father could avoid having his parental rights terminated prior to an adoption, even though he failed to comply with the requirements of section 63.062(2). In fact, section 63.054(1) contemplates that the termination of parental rights proceedings will operate against unmarried biological fathers in order to promote finality and certainty by providing that an unmarried biological father must file a claim of paternity with the Registry "[i]n order to preserve the right to notice and consent to an adoption."
Further, section 63.022(4)(a), Florida Statutes (2005), states that one of the safeguards intended to be provided by the chapter is that the minor be "legally free for adoption." In order for the child to be determined "legally free for adoption," the Legislature must have intended to make provision for the trial court to terminate the inchoate or potential parental rights of unmarried biological fathers who have not complied with the requirements of the chapter after notice and an opportunity to do so. This intent is also evidenced in section 63.053(1), Florida Statutes (2005), which provides that an unmarried biological father's "parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the legal steps to substantiate a parental interest." Section 63.063(4)(d), Florida Statutes (2005), refers to an out-of-state unmarried biological father having taken necessary steps in that state to "protect and preserve his parental interest." These provisions indicate the Legislature's recognition that an unmarried biological father has a "parental interest" that is subject to termination under chapter 63 if the unmarried biological father does not take the actions available to him to preserve his right to consent to the termination and adoption.
Finally, section 63.088, Florida Statutes (2005), which is titled " Proceeding to terminate parental rights pending adoption; notice and service; diligent search," states *198 that an unmarried biological father is deemed to be on notice, by virtue of the fact that he has engaged in a sexual relationship with a woman, that a pregnancy might occur and that an adoption proceeding might be brought and, therefore, has a duty to protect his own rights and interests. See § 63.088(1), Fla. Stat. (2005). This statement, found in a specific provision governing proceedings for terminating parental rights, is an additional indication that the Legislature intended to allow an unmarried biological father's rights to be terminated in such a proceeding.
Although we do not agree with the Second District's statutory construction analysis, this conclusion does not end our inquiry because the key question is under what circumstances an adoption entity is required to notify an unmarried biological father of the steps he must take to preserve his ability to either consent or withhold his consent to an adoption.

II. Notice of Adoption Plan Under Section 63.062(3)
J.A. asserts that the adoption entity has a mandatory statutory obligation to notify him of the Registry requirements. HOA takes the position that it had no mandatory obligation and that service of the adoption plan and, therefore, notice of the Registry were entirely discretionary on their part. Whether the Legislature intended to impose a mandatory requirement on an adoption entity to attempt to locate and serve the unmarried biological father of the child is a matter of statutory construction. As with any case of statutory construction, we begin with the "actual language used in the statute." Borden v. East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006). This is because legislative intent is determined primarily from the statute's text. See Maggio v. Fla. Dep't of Labor & Employment Sec., 899 So.2d 1074, 1076-77 (Fla.2005).
As noted above, section 63.062(3)(a) provides that an adoption agency "may serve upon any unmarried biological father identified by the mother or identified by a diligent search of the Florida Putative Father Registry, or upon an entity whose consent is required, a notice of intended adoption plan at any time prior to the placement of the child in the adoptive home." (Emphasis supplied.) The words "may serve" may be read in two different ways. The provision can be read as providing the adoption entity with complete discretion as to whether to serve the unmarried biological father with the adoption plan, accompanied by notice of both the Registry and the required affidavit. This is the reading the Second District adopted in A.S. See 944 So.2d at 385 ("Under section 63.062(3)(a), an adoption agency has the discretion, but not a duty, to notify an unmarried biological father like A.S. of the intended adoption. . . ."). However, the provision may also be read as providing the adoption entity discretion only as to the timing of the service of the plan  specifically, up to the time of the placement of the child. Because the phrase "may serve" as used in section 63.062(3)(a) is susceptible to more than one reasonable interpretation, we apply rules of statutory construction to determine the legislative intent behind the provision.
The word "may" contained in section 63.062(3)(a) cannot be construed in isolation if to do so would render other sections of the chapter meaningless. We are required to give effect to "every word, phrase, sentence, and part of the statute, if possible, and words in a statute should not be construed as mere surplusage." American Home Assur. Co. v. Plaza Materials Corp., 908 So.2d 360, 366 (Fla. 2005) (quoting Hechtman v. Nations Title Ins., 840 So.2d 993, 996 (Fla.2003)). Moreover, "a basic rule of statutory construction *199 provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." Id. (quoting State v. Goode, 830 So.2d 817, 824 (Fla.2002)). "[R]elated statutory provisions must be read together to achieve a consistent whole, and . . . `[w]here possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'" Woodham v. Blue Cross & Blue Shield, Inc., 829 So.2d 891, 898 (Fla.2002) (quoting Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992)).
If the provision of section 63.062(3)(a) regarding service of the adoption plan is construed as entirely discretionary, the provisions of section 63.062(3)(b), Florida Statutes (2005), which indicate that the Legislature intended that the adoption entity locate and provide notice to an unmarried biological father before placement of the child in the adoptive home, would be rendered meaningless. Section 63.062(3)(b) provides that "[i]f the [birth] mother identifies a potential unmarried biological father whose location is unknown, the adoption entity shall conduct a diligent search pursuant to s. 63.088." (Emphasis supplied.) If an adoption entity is not required to serve the notice of adoption plan on a known, locatable, unmarried biological father, the Legislature's mandate that the adoption entity conduct a diligent search to locate a potential father would be meaningless.
More importantly, section 63.062(3)(b) continues:
If, upon completion of a diligent search, the potential unmarried biological father's location remains unknown and a search of the Florida Putative Father Registry fails to reveal a match, the adoption entity shall request in the petition for termination of parental rights pending adoption that the court declare the diligent search to be in compliance with s. 63.088 and to further declare that the adoption entity shall have no further obligation to provide notice to the potential unmarried biological father and the potential unmarried biological father's consent to the adoption shall not be required.
(Emphasis supplied.) Similarly, if section 63.062(3)(a) does not require that notice of the adoption plan be served on an unmarried biological father who has not filed with the Registry, then there would be no reason to mandate that the adoption entity ask the court to declare that the adoption entity has "no further obligation to provide notice to the potential unmarried biological father." Reading subsection (3)(a) in pari materia with subsection (3)(b) indicates that the adoption entity has an obligation to timely serve notice of the intended adoption plan, including both notice of the Registry and the affidavit requirements, on any unmarried biological father who is known and locatable.
Section 63.054, which establishes the Registry, also supports this construction of section 63.062(3)(a). Section 63.054(13), Florida Statutes (2005), provides that "[t]he filing of a claim of paternity with the Florida Putative Father Registry does not excuse or waive the obligation of a petitioner to comply with the requirements for conducting a diligent search and inquiry with respect to the identity of an unmarried biological father or legal father which are set forth in this chapter." Again, this provision would be meaningless if the adoption entity had no obligation to identify and serve notice of the intended adoption plan on unmarried biological fathers who had not filed with the Registry, especially as it relates to those fathers actually known to the mother.
*200 Further, a reading of section 63.062(3)(a) that leaves service of the intended adoption plan on a known, locatable, unmarried biological father completely at the unfettered discretion of the adoption entity may result in disparate treatment of similarly situated unmarried biological fathers, a result that the Legislature could not have reasonably intended. Allowing an adoption entity to have unfettered discretion in deciding whether to serve an unmarried biological father with an adoption plan may also implicate due process concerns. Because we conclude as a matter of statutory construction that an adoption entity is required to serve notice of the adoption plan, which contains notice of the Registry and affidavit requirements, we do not reach the constitutional questions raised by J.A. Moreover, by interpreting section 63.062(3)(a) to require that notice be served by the adoption entity on known or identified potential fathers who are locatable, we avoid any ruling in this case on potential constitutional implications to the statutory scheme, either facially or as applied, by providing the unmarried biological father a reasonable opportunity to comply with the statutory requirements.
We recognize that the Legislature has declared that the inchoate parental interest of an unmarried biological father acquires constitutional protection only when the father "demonstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and after the child's birth" and that "[t]he state has a compelling interest in requiring an unmarried biological father to demonstrate that commitment by providing appropriate medical care and financial support" by establishing legal paternity rights in accord with the chapter. § 63.022(1)(e), Fla. Stat. We conclude that there is no conflict between these declarations of legislative intent and a reading of section 63.062(3)(a) that requires unmarried biological fathers who are known or identified as potential fathers and who are locatable be given timely notice of the intended adoption plan, which must include notice of the Registry and of the requirement to file an affidavit indicating their commitment to the child. Under the legislative scheme, if an unmarried biological father, who is served timely notice of the intended adoption plan, does not demonstrate a "full commitment to his parental responsibility" by failing to timely file a notarized claim of paternity form with the Registry or otherwise failing to meet the requirements of section 63.062(2)(b), any parental rights he has with respect to the child will be terminable without his consent.[6]
In sum, we conclude that section 63.062(3)(a), when read in pari materia with related provisions in chapter 63, evinces legislative intent that an adoption entity must serve a known, locatable, unmarried biological father with notice of the adoption plan. The notice must advise the unmarried biological father that he has thirty days after service in which to file a claim of paternity with the Florida Putative Father Registry and, if he desires to contest the adoption plan, to file an affidavit of commitment in the court, which are both required in order to establish and preserve his right to be made a party to any proceeding to terminate his parental rights and to establish that his consent is required to the proposed adoption.

III. This Case
In this case, it is undisputed that J.A. did not file a claim of paternity with the Registry and did not file the affidavit *201 of commitment. Without actually serving notice of intended adoption plan on J.A. pursuant to section 63.062(3)(a), HOA sent a certified letter to J.A. on July 21, 2005, requesting that he contact the adoption agency regarding a legal matter involving the pregnancy and indicating that the adoption disclosure statement required by section 63.085 was enclosed. On August 1, 2005, four days before the birth, HOA sent J.A. another letter. Neither letter advised J.A. of the statutory Registry requirement.
On August 8, 2005, HOA filed a petition for termination of parental rights against J.A. Pursuant to section 63.087, Florida Statutes (2005), HOA served J.A. with a summons, notice of petition, and notice of hearing in order to terminate his parental rights pending adoption. These documents informed J.A. that he was "required to serve written defenses to the . . . petition," and advised him that his failure to file a written response and appear at the hearing "constitutes grounds upon which the trial court shall end any parental rights."
Although both sections 63.085 and 63.087 appear to apply only to persons whose consent is required, HOA provided J.A. with the notices contemplated by these provisions. By reading section 63.062(3)(a) as requiring HOA to serve J.A. with the adoption plan, the statutory scheme is construed to achieve a consistent whole, ensuring that J.A. is served with notice of all the steps he must take to preserve his right to consent to the termination of his parental rights and the adoption.
Although J.A. failed to file a claim of paternity with the Registry, he did file a separate petition to determine paternity on the day the child was born in the circuit in which the child was born. On August 8, 2005, three days after the birth and after the paternity action was filed, a petition to terminate J.A.'s parental rights was filed in the Thirteenth Circuit Court in Hillsborough County. J.A. filed a response denying all of the allegations in the petition for termination.
Because J.A. was not served with notice under section 63.062(3)(a) that he had thirty days in which to file a claim of paternity with the Florida Putative Father Registry, we conclude, in this case, that his timely filing of the petition to determine paternity before the petition for termination of rights was filed is the legal and functional equivalent of a timely filed claim of paternity with the Registry. However, just as the filing of a claim of paternity with the Registry is not all that is required in order to make his consent to the adoption necessary, neither is the filing of the paternity action alone sufficient in this case to require J.A.'s consent to the adoption.
As previously discussed, with regard to children under six months of age at the time the child is placed with the adoptive parents, the statute requires additional important commitments: (1) filing an affidavit expressing that he is "personally fully able and willing to take responsibility for the child, setting forth his plans for care of the child, and agreeing to a court order of child support" and to a contribution to the mother's expenses during the pregnancy and the child's birth "in accordance with his ability to pay"; and (2) if he had knowledge of the pregnancy, having paid "a fair and reasonable amount of expenses incurred in connection" with the pregnancy and birth in accordance with his financial ability to pay and "when not prevented from doing so by the birth mother or person or authorized agency having lawful custody of the child." § 63.062(2)(b)(2)-(3), Fla. Stat.
In this case, there is neither a transcript of the termination of parental rights hearing nor any evidence in the record as *202 to whether J.A. demonstrated or was provided an opportunity to demonstrate his compliance with the two statutory requirements, apart from the Registry requirement, that indicate his "commitment to his parental responsibility." J.A. was not notified of the requirements under section 63.062(2)(b)(2), that upon service of a notice of an intended adoption plan or petition for termination of his parental rights, he had to execute and file an affidavit stating that he is personally able to care for the child, setting forth his plans for care of the child, and agreeing to court-ordered child support or contribution to the mother's expenses for the pregnancy and birth of the child depending on his ability to pay. Therefore, on remand we direct the trial court to provide J.A. with an opportunity to comply with the requirements of this subsection.
As to section 63.062(2)(b)(3), there is insufficient evidence in the record to determine whether J.A. provided the mother with financial assistance based on his ability to pay. Although the mother included an affidavit in the petition for termination of parental rights alleging that J.A. failed to financially contribute or contact her during the pregnancy even after he was informed that he might be the father, J.A. filed a response to the petition denying all of the allegations contained therein. J.A. also asked the trial court to take judicial notice of the records filed in the paternity action, which included a financial disclosure form that indicated that J.A. had a net monthly income of $1300. Accordingly, the question of J.A.'s compliance with this subsection requires a factual determination that should also be addressed on remand. Whether the notices provided by HOA or its actions or the mother's actions "prevented" J.A. from complying with this provision would be part of that factual determination. If the trial court finds that J.A. did not comply with this subsection, then J.A.'s parental rights may be terminated.
If J.A. demonstrates compliance with all applicable subsections, then the trial court must determine if his consent is required for the adoption. However, the adoption entity may pursue its claim of abandonment under sections 63.089, 63.064(1) and 63.032(1), as pled in the petition for termination of parental rights.[7]

CONCLUSION
For the reasons stated above, we conclude that under section 63.062(3)(a), an adoption entity must serve an unmarried biological father, who is known or identified by the mother as a potential father and who is locatable through diligent search, with a notice of the intended adoption plan. Pursuant to statute, that plan must advise him that he has thirty days in which to file a claim of paternity with the Florida Putative Father Registry and to file an affidavit of commitment in the court, which are both required in order to establish and preserve his right to be made a party to any proceeding to terminate parental rights and to establish that his consent is required to the proposed adoption. If the unmarried biological father, after being notified of the Registry requirements, does not file a claim with the Registry within the thirty-day period, his rights may be terminated without his consent based on his noncompliance.
The Legislature has found that "[t]he state has a compelling interest in providing stable and permanent homes for adoptive *203 children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." § 63.022(1)(a), Fla. Stat. Our construction of section 63.062(3)(a) furthers these interests by ensuring that those unmarried biological fathers, who are known and locatable after a diligent search, are served with notice of the actions they must take to establish their right to notice of and consent to adoptions, thereby reducing after-the-fact challenges to terminations of parental rights and adoptions. In cases where the adoption is sought at the time of birth, this interpretation of section 63.062(3)(a) ensures that the child's placement will be determined as close to the birth as possible.
We quash the Second District's decision in J.A. and disapprove of the Second District's decisions in J.C.J. and A.S., to the extent they hold that an unmarried biological father's parental rights can never be terminated based on his failure to file a claim of paternity with the Registry. We also disapprove these decisions, as well as the First District's decision in S.D.T. v. Bundle of Hope Ministries, Inc., 949 So.2d 1132 (Fla. 1st DCA 2007), to the extent they hold, as a matter of statutory construction, that a trial court does not have the authority to terminate the rights of a father whose consent is not required. Because we conclude that an unmarried biological father's parental rights may be terminated in a proceeding under chapter 63, we further disapprove of the Second District's general holding in J.A., J.C.J., and A.S., that when a paternity action is pending, that action must be resolved prior to adjudicating a petition that seeks to terminate the parental rights of a person whose consent is not required.[8] Finally, we disapprove the Fifth District's decision in A.F.L. v. Department of Children & Families, 927 So.2d 101 (Fla. 5th DCA 2006), to the extent it holds that an unmarried biological father's parental rights can be terminated based on his failure to file a claim of paternity with the Registry regardless of whether he was served with notice of the Registry.
We remand this case for further proceedings in accordance with this opinion and direct that the proceedings be expedited to prevent any further uncertainty or disruption in the life of this child.[9]
It is so ordered.
ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., specially concurs with an opinion.
LEWIS, C.J., concurs in result only with an opinion.
WELLS, J., recused.
ANSTEAD, J., specially concurring.
I concur in the majority's statutory construction analysis and especially its conclusion under that analysis that unmarried *204 biological fathers, like J.A., must first be provided notice and a fair opportunity to comply with the obligations the Legislature has placed on such fathers, before such a father's parental rights may be terminated. As noted in the majority opinion, this construction not only has properly identified the Legislature's intent to require notice, it also avoids those constitutional due process concerns that would have to be faced if we were to accept the contrary and extreme position urged by petitioner that parental rights could be terminated with no notice whatsoever.
LEWIS, C.J., concurring in result only.
I concur in result only because although I cannot agree that the statutory analysis undertaken by the majority yields this result, the result is required through the analysis necessary to avoid certain constitutional conflicts while avoiding a direct constitutional construction. The first step in the present circumstances is to address the protected interests, if any, that are impacted by the statutory scheme we are asked to interpret and apply. I conclude that the protected interest of an unmarried biological father in the opportunity to develop a relationship with his child that is placed for adoption necessitates a statutory interpretation which is in harmony with the conclusion of the majority  the Florida Statutory scheme requires notice to known, locatable unmarried biological fathers.
THE INTEREST OF UNMARRIED BIOLOGICAL FATHERS IN THEIR CHILDREN PLACED FOR ADOPTION
The United States Supreme Court has addressed the interest of unmarried biological fathers in their children in a handful of seminal cases. In Stanley v. Illinois, 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held unconstitutional an Illinois law which presumed that all unmarried biological fathers were unfit parents, and noted that the "private interest . . . of a man in the children that he has sired and raised, undeniably warrants deference and, absent powerful countervailing interest, protection." Id. at 651, 92 S.Ct. 1208. Subsequently, in Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), the Court permitted the adoption of a child by his stepfather over the objection of his biological father because the biological father had "never exercised actual or legal custody over his child, and thus had never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." Id. at 256, 98 S.Ct. 549. In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court held that a New York statute that required the consent of an unmarried mother to the adoption of her children but contained no similar requirement for the consent of an unmarried biological father violated equal protection where the unmarried biological father had developed a substantial relationship with his children, had lived with the children and their mother during the period in which both children were born, and had provided financial support for the family. See id. at 382, 394, 99 S.Ct. 1760. A unifying premise between these cases is that the Court draws a distinction between unmarried biological fathers who have developed a relationship with their child and fathers without such a relationship.
Finally, in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the Court held that an unmarried biological father who had made absolutely no attempt to develop a relationship with his child in the two years following birth was not denied due process when he was given no notice of proceedings in which the *205 child's stepfather sought to adopt the child because the father would have received notice had he registered with the New York putative father registry. See id. at 263-65, 103 S.Ct. 2985. The Court stated with regard to an unmarried biological father's constitutional interest in his child:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "coming forward to participate in the rearing of his child," his interest in personal contact with the child acquires substantial protection under the Due Process Clause. At that point it may be said that he "acts as a father toward his children." But the mere existence of a biological link does not merit equivalent protection.
Id. at 261, 103 S.Ct. 2985 (citations and alterations omitted) (quoting Caban, 441 U.S. at 389 n. 7, 392, 99 S.Ct. 1760). Pertinent to the instant analysis, the Court added with regard to this biological link:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Id. at 262, 99 S.Ct. 1760 (footnote omitted).
Although Lehr speaks to the opportunity of an unmarried biological father to develop a relationship with his child, a difficult situation arises when a child is placed for adoption as a newborn because the father will have very little, if any, time in which to grasp the opportunity to develop this relationship. Although the United States Supreme Court has yet to directly confront the issue of the interest of an unmarried biological father in his newborn child, a number of state courts which have considered this specific issue have interpreted Lehr to establish the principal that an unmarried biological father does have a constitutionally protected, inchoate interest in the opportunity to develop a relationship with his child. See Adoption of Kelsey S., 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, 1229 (1992) (citing In re Raquel Marie X, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418 (1990), as establishing that unmarried biological fathers of children placed for adoption before any substantial relationship could develop have a protected constitutional interest in the opportunity to develop relationships with their children); In re Petition of Steve B.D., 112 Idaho 22, 730 P.2d 942, 945 (1986) ("Lehr indicated both that the state may not deny due process and equal protection to unwed fathers who enjoyed established relationships with their children, and that the state may not deny unwed fathers the opportunity to establish such relations  what the Court described as `the inchoate interest in establishing a relationship with [the child].'"); In re Adoption of B.G.S., 556 So.2d 545, 551 (La.1990) ("It may be more difficult for a recently born child's father to adduce objective proof of his commitment to parental responsibilities, but the due process guarantee is not so narrow as to permit a state to deny him the chance to do so."); Smith v. Malouf, 722 So.2d 490, 496 (Miss.1998) (relying on the New York decision in Raquel Marie X as establishing that fathers have a constitutionally protected interest in the opportunity to develop a relationship with their children); In re Raquel Marie X, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, 424 (1990) ("In the case of a child *206 placed for adoption at birth, the father can have no more than a biological connection to the child, there having been no chance for a custodial relationship. Protection of his parental interest would depend, then, upon recognition of a constitutional right to the opportunity to develop a qualifying relationship with the infant."). On the other hand, I recognize that some state courts that have addressed this issue have interpreted Lehr to the contrary as establishing that the constitution does not afford any protection to this opportunity. See In re Pima Cty. Juv. Severance Action, 179 Ariz. 86, 876 P.2d 1121, 1129 (1994); Escobedo v. Nickita, 365 Ark. 548, ___ S.W.3d ___, ___, 2006 WL 563600, at *6 (Mar. 9, 2006). However, in my view those cases which have recognized some constitutional protection for this interest and, if exercised, this right are more persuasive.
It appears to me that the decision of the United States Supreme Court in Lehr recognizes that unmarried biological fathers do possess a protected interest in the opportunity to establish a substantial relationship with their child placed for adoption. See Lehr, 463 U.S. at 262, 103 S.Ct. 2985. In fact, even the Florida Legislature has recognized that unmarried biological fathers have an interest in this opportunity. See § 63.022(1)(e), Fla. Stat. (2006). The State cannot simply terminate a father's parental rights under these circumstances without first affording him this opportunity. Further, once an unmarried biological father has come forward and seized that opportunity by "accept[ing] some measure of responsibility for the child's future," Lehr, 463 U.S. at 262, 103 S.Ct. 2985, that inchoate interest transforms into a vested constitutionally protected parental right which the State can not terminate without due process protections.
Additionally, the Florida Constitution provides an independent basis for the protection of this opportunity for unmarried biological fathers in Florida under our independent Right to Privacy Clause which states that "[e]very natural person has the right to be let alone and free from governmental intrusion into the person's private life." Art. I, § 23, Fla. Const. This Court has recognized that "Florida is one of only a handful of states wherein the state constitution includes an independent, freestanding Right of Privacy Clause." N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 634 (Fla.2003). This right to privacy "embraces more privacy interests, and extends more protection to the individual in those interests, than does the federal Constitution." Id. at 619 (quoting In re T.W., 551 So.2d 1186, 1192 (Fla.1989)). The interest of a parent in the upbringing of his or her children has been acknowledged by this Court as a fundamental liberty interest under the Florida right to privacy. See Beagle v. Beagle, 678 So.2d 1271, 1275 (Fla.1996). Although the United States Supreme Court has recognized a similar parental interest under the Due Process Clause of the United States Constitution, the fundamental parental interest stemming from the Florida Constitution necessarily extends more protection to individuals than does its federal counterpart. See N. Fla. Women's, 866 So.2d at 619. Accordingly, even if the analysis of Lehr undertaken above is an incorrect extension of the interpretation of federal precedent, I would still conclude that an unmarried biological father possesses a constitutionally protected, inchoate interest in the opportunity to develop a relationship with his child under the privacy clause of the Florida Constitution when his child is placed for adoption under these circumstances. Once an unmarried biological father takes affirmative steps to grasp that opportunity, his inchoate *207 interest transforms into a vested constitutionally protected right. To the extent that the Florida statutory scheme we must consider today can be interpreted to preclude such an opportunity or summarily terminate such a vested right without notice or meaningful due process, the law would contravene the right to privacy provision of the Florida Constitution.
CONSTRUING THE STATUTORY SCHEME WITHIN THE CONSTITUTIONAL FRAMEWORK
The provisions of this adoption statute purport to treat all unmarried biological fathers in an identical manner, and there are no provisions with regard to exceptions or extenuating circumstances which might alter the unambiguous directive in section 63.062(2)(d) that an unmarried father who fails to file with the Registry is deemed to have waived all rights with regard to the adoption proceedings, including the right to notice. See § 63.062(2)(d), Fla. Stat. (2005). The Fourth District Court of Appeal has previously expressed apprehension as to the constitutionality of this provision in all circumstances in its decision in J.S. v. S.A., 912 So.2d 650 (Fla. 4th DCA 2005), in which the district court noted its "concern about potential due process problems in rigidly applying these provisions without regard to good cause exceptions or extenuating circumstances." Id. at 661 n. 1. I agree with the district court's concern that the statute, if construed in a manner which would not require due process protections for known, locatable unmarried biological fathers, would not adequately apply in all circumstances without encountering constitutional problems by terminating the opportunity of such fathers to develop a relationship with their child.
This Court has long recognized the fundamental principle that a statute will be construed to be constitutional whenever possible, noting:
This Court is bound to resolve all doubts as to the validity of the statute in favor of its constitutionality, provided the statute may be given a fair construction that is consistent with the federal and state constitutions as well as with legislative intent.
Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 51 (Fla.2000) (internal quotation marks and alteration omitted). It appears that if this statutory scheme is to be universally applied without conflict with protected interests, a known, unmarried biological father in this adoption context must be given notice of the pregnancy and the statutory requirements for the protection of parental rights with respect to the child, as well as an opportunity to comply with those requirements, before his failure to register with the Registry can operate to effectively and summarily terminate parental rights. A review of the statutory scheme reveals a reasonable construction that would comport with these constitutional parameters and the legislative intent of finality and stability in adoption proceedings.
Section 63.088(1) states that "[a]n unmarried biological father, by virtue of the fact that he has engaged in a sexual relationship with a woman, is deemed to be on notice that a pregnancy and an adoption proceeding regarding that child may occur." § 63.088(1), Fla. Stat. (2006). Such notice, if the act of sexual intercourse can be considered notice at all, is entirely inadequate to protect the inchoate interest of a known, unmarried biological father in the opportunity to develop a relationship with his child placed for adoption at birth. A father cannot be deemed to have failed to grasp something of which he was entirely unaware and completely precluded. Until an unmarried biological father is given actual *208 notice of a pregnancy and an opportunity to take the action required by the statutes to preserve his parental rights with respect to the child, the statutory scheme cannot operate to summarily terminate his protected interest.
The statutory scheme contains two provisions which concern notice to the unmarried biological father of the adoption proceedings. Section 63.085, under which HOA provided the adoption disclosure form to J.A. in this case, requires that an adoption agency provide the adoption disclosure form to the parent who did not initiate contact with the adoption agency within fourteen days after that parent is identified and located. See § 63.085(1), Fla. Stat. (2006). The statute directs that this disclosure "must" be made. See id. Notably, while this disclosure informs a putative father that he "may sign a valid consent for adoption at any time after the birth of the child," it does not contain any information as to how the father may contest the adoption or assert his paternal rights. Id.
The only section of the statute that addresses notice to an unmarried biological father as to the manner in which he may assert his parental rights is section 63.062(3)(a), which, as noted by the majority, states that an adoption entity "may" serve an unmarried biological father with a notice of intended adoption plan. See § 63.062(3)(a), Fla. Stat. (2005). The notice contemplated by this section would adequately apprise an unmarried biological father of the legal actions required by the statutory scheme for him to grasp the opportunity to develop a relationship with his child. More importantly, if provided to unmarried biological fathers in situations where placement of the child for adoption shortly after birth is contemplated, this notice will guarantee that the statutory scheme does not deprive the father of his protected interest. Although the statute uses the word "may," "it is settled that the word `may' is not always permissive, but may be a word of mandate in the appropriate context . . . especially . . . where the statute in question is necessary to preserve a constitutional right." Myles v. State, 602 So.2d 1278, 1281 (Fla.1992). Only an interpretation of this notice provision as mandatory will preserve the protected interest of a known, unmarried biological father in the opportunity to develop a relationship with his child that is being placed for adoption. Therefore, I conclude that this notice provision must be interpreted as mandatory, along with the mandatory disclosure requirement in section 63.085, with regard to all known, locatable unmarried biological fathers. Read in pari materia, sections 63.062(3) and 63.085 require that a known, locatable unmarried biological father receive notice of the following: the intended adoption proceeding, the earliest time at which he can surrender his parental rights if he so desires, and the manner in which he can assert his parental rights if he desires to take responsibility for his child rather than allowing his parental relationship to be terminated through adoption.
In addition to construing the notice provision in section 63.062(3) as mandatory, it is my view that the statutory scheme may not operate to deprive an unmarried biological father of his inchoate protected interest without providing a reasonable opportunity for compliance with the statutory requirements. Therefore, section 63.062(2) cannot be construed to preclude this opportunity after the required notice is served. To the extent that section 63.062(2)(b) states that a father must take the enumerated actions prior to the execution of a consent for adoption by the mother, I construe this provision to apply only in situations where the known, locatable unmarried biological father has received *209 the required notice under section 63.062(3), and the thirty-day period contained in that notice has run without the father taking the necessary legal action. Similarly, to the extent that section 63.062(2)(d) purports to terminate the rights of an unmarried biological father with respect to the adoption of his child, I would similarly interpret that provision to apply only in situations where the required notice has been served and the prescribed time period has lapsed without the father asserting his parental rights. Again, this construction comports with the long-established rule of statutory interpretation that dictates that statutes should be read as valid and constitutional whenever possible. See Myles, 602 So.2d at 1281.
The interpretation that the notice described in section 63.062(3) is mandatory will not place any excessive burden on adoption entities. The adoption entity is already required to provide the adoption disclosure form to known, locatable unmarried biological fathers. Construing the notice provision in section 63.062(3) as mandatory simply directs the adoption entity to provide the notice of intended adoption plan along with the adoption disclosure. In addition, if the inquiry conducted by the court pursuant to section 63.088 reveals a locatable unmarried biological father, both the adoption disclosure requirement under section 63.085 and the notice of intended adoption plan requirement under section 63.062(3) will be triggered.
Additionally, the requirement that known, locatable unmarried biological fathers are to be provided with the notice of the intended adoption plan will prevent the sort of misleading partial disclosure that occurred in the instant matter. The August 1, 2005, letter from HOA to J.A. could have been understood by J.A. to require that he provide one hundred percent of the birth mother's living expenses as the only manner in which he could preserve his interests. This is clearly contrary to section 63.062(2)(b)3 which states that an unmarried biological father should pay "a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability." § 63.062(2)(b)3, Fla. Stat. (2006). Instead of the required notice under section 63.062(3), J.A. was provided with misleading information by the adoption entity which misstated Florida law and misinformed him of the steps necessary to preserve his parental rights.
Finally, if an unmarried biological father does not receive the notice required under this construction of the statutory scheme, the filing of a paternity action pursuant to chapter 742 should constitute an affirmative step to grasp the opportunity to develop a relationship with his child, and reasonably be viewed as the legal and functional equivalent of filing a claim of paternity with the registry, as recognized by the majority. This result harmonizes the adoption statutes and section 742.10, which establishes that chapter 742 "provides the primary jurisdiction and procedures for the determination of paternity for children born out of wedlock." § 742.10(1), Fla. Stat. (2005). Absent notice of the statutory requirements in chapter 63, an unmarried biological father can effectively begin the assertion of his parental rights in a paternity action, as J.A. did here, and then satisfy the other requirements of the statute.

CONCLUSION
Based on the foregoing, I agree with the result of the majority and would answer the certified question in the affirmative with the added condition that an unmarried biological father's parental rights may only be terminated based on a failure *210 to register with the Registry if he has received the required notice under section 63.062(3) of the Florida Statutes and has failed to take the legal action described in that notice within the allotted thirty-day time period. However, I concur in result only based on my belief that the protected interest of known, unmarried biological fathers in the opportunity to develop relationships with their children in this adoption context must be recognized and addressed and operate to guide any subsequent statutory construction.
NOTES
[1] We substitute "unmarried biological father" for "putative father" because that is the terminology used by the Legislature in the applicable subsections of section 63.062, Florida Statutes (2005).
[2] There is no transcript of the hearing on the petition to terminate parental rights and the "Stipulated Facts" submitted by the parties as a substitute for the transcript reveals little about the background facts. We rely on documents that were attached to the petition for termination of parental rights and documents that are in the record but cannot be certain of their accuracy. Also, although the mother identified J.A. as the father and J.A. filed a separate paternity action, there is no official confirmation that J.A. is the biological father of the child. The specific relevant facts should be developed in an evidentiary hearing on remand.
[3] Although the child was born in Citrus County, which is in the Fifth Circuit, the petition alleged that venue was proper pursuant to section 63.087(2)(a)(3), Florida Statutes (2005), because "the mother executed a waiver of venue . . . and the adoption entity is located in Hillsborough County."
[4] Section 63.032(12), Florida Statutes (2005), provides that "`[p]arent' has the same meaning as ascribed in s. 39.01."
[5] Section 63.087(5), Florida Statutes (2005), requires that the petitioner serve the petition and summons "upon any person whose consent is required but who has not provided that consent."
[6] We do not discuss in this case the requirements for terminating the rights of an unmarried biological father where the child is six months or older, except that the same ruling as to when service of notice is required would also apply.
[7] Of course, all of the issues presented on remand are contingent on J.A. establishing that he is the child's biological father.
[8] We note that by filing a claim of paternity with the Registry, an unmarried biological father can request DNA testing. See § 63.054(2), Fla. Stat.
[9] We received the petition for review on April 23, 2007. We directed expedited briefing and held an expedited oral argument on June 4, 2007. We note that although the final judgment was rendered on September 27, 2005, the parties could provide no explanation as to why the Second District did not issue a decision until March 28, 2007. When the life of a child is at stake, it is critical that all parties and all courts cooperate to expedite proceedings when it is possible to do so. Of course, expediency can never come at the expense of justice. We hope that whatever the legal outcome of these proceedings, the parties can work together to do what is in the best interests of this child.