985 So.2d 1001 (2008)
THE FLORIDA BAR, Complainant,
v.
Joyce Sibson DOVE, Respondent.
Nos. SC05-302, SC05-1157.
Supreme Court of Florida.
June 12, 2008.
*1002 John F. Harkness, Jr., Executive Director, Kenneth Lawrence Marvin, Director of Lawyer Regulation, and Kristin A. Godwin, Bar Counsel, The Florida Bar, Tallahassee, FL, for Complainant.
Joyce Sibson Dove, pro se, Tallahassee, FL, for Respondent.
PER CURIAM.
We have for review a referee's report recommending that Joyce Sibson Dove be found guilty of professional misconduct for her actions in an adoption case. The referee recommended that Dove be disciplined by public reprimand, receive two years of probation, and forfeit fees of $8,388.84 to The Florida Bar Foundation. We have jurisdiction. See art. V, § 15, Fla. Const. We disapprove the referee's recommended sanction of a public reprimand. We also disapprove the Bar's request for a one-year suspension. We find that the violations of the Rules of Professional Conduct in this case were extremely serious and warrant a sanction of a three-year suspension. In light of our decision to impose a lengthy suspension and the Bar's concerns regarding the proposed conditions of probation, we disapprove the referee's recommendation of probation. On Dove's cross-appeal, we agree with Dove that the referee's recommendation of disgorgement of fees should be disapproved but reject her other claims.

*1003 FACTS AND PROCEDURAL HISTORY
In February 2005, The Florida Bar filed a two-count complaint alleging that Dove engaged in misconduct. In June 2005, the Bar filed a second complaint against Dove. A referee was appointed. During a hearing on the complaints, the referee dismissed count II of the initial complaint and the second complaint. After hearing the evidence and the argument of counsel, the referee made the following findings and recommendations relating to the remaining count.
Dove was a shareholder and director of the law firm known as Joyce Dove, P.A. Dove was also the President of Foundation for Children, Inc. (Corporation), which operated an adoption agency known as Foundation for Children Adoption Agency (Agency). Dove was a director and also legal counsel for the Corporation and the Agency.
The Agency was retained by prospective adoptive parents[1] to assist them in finding a child for adoption. In July 2002, a birth mother decided to place her child, born on November 26, 2001, for adoption. Her boyfriend called an "adoption hotline" to place the child for adoption. The call was referred to the Agency. Dove arranged for a contracted social worker to meet the birth mother and obtain her signature on documents to enable Dove to proceed with the termination of parental rights and subsequent adoption proceedings.
On July 17, 2002, the social worker met with the birth mother at the condominium where the birth mother lived. During this meeting, the birth mother signed a "Mother's Interview Affidavit." In the affidavit, the birth mother stated that during the prior twelve months, she had resided at a specific address in Oviedo, Florida. She did not state in the affidavit whether she had resided with anyone at that address or for what portion of the twelve-month period she resided there. Before the referee, the birth mother testified that the Oviedo, Florida, address was that of her parents and that both she and the child had resided in her parents' home from the child's birth, November 26, 2001, until at least July 6, 2002. The birth mother further testified that the child did not move with her when she moved into the condominium in July 2002 but, rather, remained living with the maternal grandparents in their home.[2] Also during the initial meeting, the birth mother advised the social worker that the man with whom she was living in July 2002 was not the biological father of her child, and she provided the social worker with the name of the child's biological father. The boyfriend executed an affidavit of nonpaternity.
On July 19, 2002, in the Second Judicial Circuit Court in Leon County, Dove filed a petition for custody of the minor child and other documents regarding the termination of parental rights in and the adoption of the birth mother's child. Notably, the petition for custody stated: "The legal father has surrendered his parental rights by affidavit." (Emphasis added.) The referee rejected Dove's argument that the *1004 birth mother's boyfriend was a "legal father."
On July 21, 2002, Dove sent her paralegal and the social worker to the birth mother's condominium to pick up the child. When they arrived, the child was at the maternal grandparents' home. The birth mother drove to the grandparents' home to retrieve the child. It was at that time that the birth mother told her parents that she was placing the child for adoption. The grandfather followed the birth mother and the child to the birth mother's condominium and there made known to the birth mother, the paralegal, and the social worker his objection to placing the child for adoption at that time. Dove's paralegal then brought the child to Tallahassee, Florida, to be placed with the adoptive family.
On July 23, 2002, Dove filed a petition for the court to accept the intended adoption placement for the minor child. This petition stated, "The minor child is currently residing with [the] birth mother for the purpose of adoption" and again asserted that the "legal father" had surrendered his rights to this child, pursuant to chapter 63 of the Florida Statutes. The referee found that Dove did not file an affidavit from either the biological father or the purported "legal father" that would allow a termination of parental rights as required by section 63.087(6)(e), Florida Statutes (2002). On July 26, 2002, Dove filed a notice of petition and hearing to terminate parental rights pending the adoption, purportedly providing notice to the biological parents of the hearing scheduled for August 21, 2002. No corresponding petition to terminate parental rights pending adoption was found in the court file or in Dove's files. The referee found that although Dove claimed to have prepared a petition to terminate parental rights, she did not file the petition with the trial court as required by section 63.087(6), Florida Statutes (2002). Finally, the referee found that Dove did not provide a copy of the notice to the biological parents.
On August 21, 2002, notwithstanding the absence of any contact with the named biological father, Dove appeared ex parte before a circuit court judge and obtained a signed order terminating parental rights. The referee found that the proposed order drafted by Dove contained false factual assertions. Dove repeated the untrue assertion that there was a "legal father" involved in the termination of parental rights pending adoption proceeding, falsely stated that the biological father was unknown, and falsely stated that the affidavits presented to the circuit court were legally sufficient for termination of parental rights under Florida Law.[3] Dove misrepresented *1005 facts known to her relating the birth father and the sufficiency of the documents presented to the trial court. The referee found that had Dove accurately represented these material facts, she would not have obtained a signed order terminating parental rights. See §§ 63.087; 63.088, Fla. Stat. (2002). Dove violated the Rules of Professional Conduct by making false statements of material fact or law to a tribunal and by failing to inform the tribunal in an ex-parte proceeding of all material facts known to the lawyer, whether or not adverse, that would enable the tribunal to make an informed decision.
Meanwhile, commencing the same day that Dove's paralegal and the social worker took custody of the child, the maternal grandparents began communicating with Dove's office. The grandparents indicated that they objected to the adoption and wanted to assert grandparental rights.[4] Dove was aware of the grandparents' objections. Several lawyers contacted Dove on behalf of the grandparents, though no lawyer formally appeared on the grandparents' behalf while the adoption proceeding was pending. Because the grandparents indicated that they were represented by a lawyer, Dove instructed her employees that they were not to communicate directly with the grandparents and that they should only take messages when the grandparents called. Before the referee, Dove acknowledged receiving a letter postmarked August 24, 2002, in which the grandparents specifically asserted their priority to adopt pursuant to section 63.0425, Florida Statutes (2002), because the child had resided with them for six months. The grandparents also wrote letters to two circuit court judges in the Second Judicial Circuit.
Despite having reason to believe that the grandparents were entitled to notice pursuant to section 63.0425, Dove did not follow the statute. She did not notify the maternal grandparents of the adoption proceeding prior to filing a petition for adoption.
On October 17, 2002, notwithstanding the known defects in the termination of *1006 parental rights proceeding and her failure to notify the grandparents, Dove filed a petition for adoption on behalf of her clients, the prospective adoptive parents. The petition falsely asserted that both the biological mother and the biological father had surrendered their parental rights. Dove attended a hearing on the petition and had the circuit judge sign the order for final adoption without informing the circuit judge of the material facts known to her. Dove did not inform the court or the adoptive parents about any of the factual or legal deficiencies about which she had the responsibility to know and in material instances did know.
Subsequent to the adoption, the grandparents and the birth mother began litigation seeking the return of the child. The parties reached a settlement, agreeing to an open adoption which allowed the grandparents and the birth mother visitation rights with the child. The adoptive parents initiated a malpractice action against Dove, which was also settled. The adoptive parents paid $15,000 for the adoption, of which $1,611.16 was used for out-of-pocket expenses. Dove and her insurance carrier returned the entire fee.
The referee found that Dove's actions were violations of Rule Regulating the Florida Bar 4-1.1 (competence); rule 4-3.3(a)(1) (candor toward the tribunal  false statements); and rule 4-3.3(d) (candor toward the tribunal  ex parte proceedings). First, as to rule 4.1.1, Dove was retained to accomplish an adoption. While an adoption was ultimately achieved through the settlement, the adoption was much different than the adoption sought by the adoptive parents, who were Dove's clients. She failed to perform the legal service for which she was engaged. Second, as to rule 4-3.3(a)(1), the referee found that almost all of the documents filed by Dove in the termination of parental rights pending adoption and adoption proceedings, including both the order of termination of parental rights and the order for final adoption submitted to the circuit court, contained material misstatements. Third, as to rule 4-3.3(d), Dove's failure to inform the tribunal of material facts and issues in the case deprived the tribunal of the ability to make informed decisions.
The referee thereafter held a hearing on sanctions. Dove presented mitigation evidence through the testimony of Kent Spuhler, the Executive Director of Florida Legal Services, Marcia Lynn Hilty-Reinshuttle, Director of the Guardian Ad Litem Program for the Second Judicial Circuit, and a circuit judge before whom Dove had performed legal services in other cases.
Spuhler testified that Dove has provided outstanding service to Florida Legal Services on a rolling basis for many years. He credited Dove with successfully lobbying Congress for continued federal funding for the organization and with successfully lobbying the Florida Legislature to obtain a statutory guarantee of continued county funding. Spuhler described Dove as being "passionate about people being able to get fair treatment in our legal system." He stated that Dove has always been someone on whom he could rely and explained that Dove devoted more time to the cause than called for by her contract, without ever requesting an increase in pay from the original base rate of $35 per hour.[5]
Hilty-Reinshuttle testified that Dove has worked extensively on behalf of the Guardian Ad Litem Program, as a guardian ad litem, as a board member, and as a fundraiser. The circuit judge testified that Dove had recently done a "terrific *1007 job" handling a complex family law case involving a difficult client and dependency, domestic violence, and dissolution of marriage issues. She explained that she has known Dove for at least ten years and that prior to learning the details of this disciplinary proceeding, she never had reason to question Dove's integrity and found Dove to be at all times professional, courteous, and capable. The circuit judge expressed deep dismay when the facts of Dove's handling of this case were pointed out to her.
Dove testified on her own behalf at the sanction hearing as well. Dove described her volunteer efforts on behalf of the Ukraine Project, which provides supplies to Ukrainian hospitals and orphanages and brings Ukrainian children with serious medical conditions to Florida for treatment.[6] She testified that she has volunteered for the Guardian Ad Litem Program in varying capacities for fifteen years, mentored high school students, and worked for the Florida State University Florida Child Advocacy Center as a law student and after graduation. Dove presented numerous awards that she has received for her public service and humanitarian efforts. In addition to these volunteer efforts, Dove described her professional career. She testified that prior to going to law school, she worked for American manufacturing firms in the United States and overseas. After becoming a member of the Bar, Dove became International Counsel to then Governor Lawton Chiles and ran agencies that the Governor created to foster international courts and international trade. Dove opened her own practice in 1994. She explained that she decided to practice children's law, specifically dependency, because she learned from a circuit judge that attorneys were badly needed in that area. Dove testified that court-appointed dependency work has been a major portion of her practice and that at the time of the hearing, she had a contract with State of Florida Justice Administrative Commission to do such work.
At the close of this evidence, the Bar argued that the referee should suspend Dove for a period of one year.
The referee found the following aggravating factors: (1) at the time of the misconduct, Dove was fifty-five years old and an attorney with ten years of experience as a member of the Bar; (2) Dove made several misrepresentations to the Court; (3) the adoptive parents and the child were at Dove's mercy; and (4) Dove had considerable experience in adoption proceedings. The referee found the following mitigating factors: (1) Dove had no prior disciplinary record; (2) she was not trying to be dishonest; (3) Dove's community service with regard to the Ukraine Project, the Guardian Ad Litem Program, and other services that benefit children was impressive; (4) the circuit judge's evaluation of recent cases with Dove showed interim rehabilitation; and (5) Dove was remorseful.
After considering the extensive testimony presented in this case, the aggravating and mitigating factors, and the one-year suspension sought by the Bar, the referee recommended that Dove be disciplined by: (1) public reprimand; (2) two years of probation; and (3) forfeiture of fees, with Dove paying $8,388.84 to The Florida Bar Foundation. The referee also recommended that Dove pay the Bar's costs of $14,057.63.
*1008 The Bar petitions this Court for review, arguing that the referee's recommended disciplinary sanctions are too lenient and are not supported by Florida disciplinary law. The Bar asserts that Dove should be suspended for one year. The Bar also argues that the referee's recommendation of probation is infeasible and should be modified. Dove accepts the referee's recommendation of public reprimand followed by probation but challenges the referee's recommendations as to disgorgement and the award of costs to the Bar.

ANALYSIS
The Bar argues that the referee's recommended disciplinary sanction of a public reprimand is not supported by case law or the Florida Standards for Imposing Lawyer Sanctions. In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. The Court has held that a referee's recommendation is persuasive and that generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999). We respect that in recommending discipline, as in determining whether ethical violations exist, the referee in a Bar proceeding occupies a favored vantage point for assessing key considerations  such as a respondent's degree of culpability and his or her cooperation, forthrightness, remorse, and rehabilitation (or potential for rehabilitation). Fla. Bar v. Lecznar, 690 So.2d 1284, 1288 (Fla.1997). On the other hand, we have also recognized that because discipline is the ultimate responsibility of this Court, this Court may impose a stiffer sanction than the referee has recommended or the Bar has sought. Fla. Bar v. Tobkin, 944 So.2d 219, 226 (Fla.2006).
The instant case presents the rare circumstance where this Court's responsibility to the public compels us to depart from both the referee's recommended discipline and from the Bar's requested discipline. In this proceeding, both Bar counsel and the referee were conscientious in considering the evidence and in seeking and recommending a sanction reflecting the substantial mitigation present in this case. However, as Bar counsel asserted before the referee, this is a disciplinary case of first impression. The Court has not previously faced the need to discipline a lawyer for such serious misconduct in the sensitive context of an adoption proceeding. Overall, we find that the referee's recommended sanction of a public reprimand is not in accord with the Florida Standards for Imposing Lawyer Sanctions, which we have approved for The Florida Bar, or with our case law. A public reprimand does not adequately address the seriousness of Dove's ethical violations. Though we accept the referee's findings as to other mitigation, we reject the referee's finding that Dove was not trying to be dishonest because it is not supported by competent, substantial evidence. Thus, we agree with the Bar that the ethical violations require that Dove be suspended. We disagree with the Bar that one year is sufficient. Due to the severity of Dove's misconduct and the vulnerabilities of the parties to the adoption, we conclude that the length of the suspension should be three years.
Our analysis of the proper discipline begins with the Florida Standards for Imposing Lawyer Sanctions. In this case, the *1009 referee found and our review of the record confirms that Dove made knowing material misrepresentations to the termination of parental rights and adoption courts, did not deal with those tribunals with candor, and withheld material information from the courts, which potentially could cause and did cause a significant adverse effect on the legal proceedings and the interested parties. We conclude that standards 6.11 and 7.1, which specify disbarment, fit Dove's conduct.[7]
Determining that these standards apply and thus a presumption of disbarment exists does not end our analysis of the appropriate discipline. Imposition of discipline is not a robotic application of those standards. Rather, we have repeatedly stated that sanctions imposed upon a member of the Bar for ethical misconduct must: (1) be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing a sanction; (2) be fair to the attorney by being sufficient to punish a breach of ethics and at the same time encouraging reformation and rehabilitation; and (3) be severe enough to deter others who might be prone or tempted to become involved in like misconduct. Fla. Bar v. Cox, 794 So.2d 1278, 1286 (Fla.2001).
In respect to criterion (1), we find that protection of the public from this type of unethical conduct would support the most severe punishment of disbarment. Dove represented adopting parents who were dependent upon their counsel to provide competent representation so that they and their adopted child would have the security of stable legal status as their new relationship was nurtured into a family relationship. An adopting family can only have this security where the biological parents and other individuals contemplated under the statutes have been given proper notice and afforded due process and the adopting court is provided accurate documents. In addition, Dove had a professional responsibility to deal fairly, accurately, and honestly with the biological parents and the maternal grandparents in this adoption.
In the adoption proceedings in this case, as in many adoption proceedings, the unrepresented birth parents did not attend the hearings. Here, the biological family may not have attended because notice was not served.[8] Regardless of why the biological family is not in attendance, in all such ex-parte hearings the court and the parties depend on the lawyer who is present to fulfill his or her duty to disclose material facts that are known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision. See R. Regulating Fla. Bar 4-3.3 cmt. Ex parte proceedings. We expect *1010 and require lawyers in adoption proceedings to fulfill this duty.
We also find that criterion (3) supports disbarment. This Court is committed to the best interests of children. Lawyers who undertake representation in the vital areas of adoption, dependency, and delinquency and in other family law cases serve interests which have unexcelled importance in the law. We expressly advise lawyers that we applaud and appreciate their service in this representation but that the service must be performed in compliance with the Rules of Professional Conduct. If it is not, we will deal harshly with the violations.
Though we find that criteria (1) and (3) support disbarment, in considering criterion (2) we are mindful of the mitigation found by the referee and existent in the record. Dove has worked as a court-appointed family law attorney since the mid-1990s and has served the Guardian Ad Litem Program since 1990. Dove's lobbying efforts on behalf of Florida Legal Services and her contributions to continuing legal education publications in the area of adoption law further demonstrate her commitment to public service and the legal community. We also consider that the record indicates that Dove has shown substantial evidence of rehabilitation. The misconduct discussed in this opinion occurred in 2002. The circuit judge testified to Dove's excellent handling of a particularly complicated family law case beginning in 2005 and her professional and competent performance generally. We agree with the referee that the record indicates that Dove's handling of the adoption discussed in this disciplinary opinion was one very bad episode in what appears to have otherwise been a career of constructive and positive service.
In Florida Bar v. Cox, 794 So.2d 1278 (Fla.2001), we had before us a case in which the issue was candor to the court and material misrepresentations in a criminal proceeding. As here, the referee in Cox recommended that the attorney be disciplined by public reprimand. The Bar appealed, seeking a three-year suspension. In our decision, as we do here, we recognized that the standards made disbarment the presumptive sanction. However, we also recognized that there was substantial mitigation found by the referee. We did not follow the referee's recommendation of public reprimand, nor did we disbar. We suspended Cox for one year.
It is our conclusion that we should follow our decision in Cox in this case and reject the referee's recommendation of public reprimand. We will similarly not follow the presumption of disbarment because of the mitigation, which includes evidence of rehabilitation. We conclude that in this case, the imposition of a three-year suspension will best meet the criteria for imposition of discipline. Three years is the most severe suspension under the Rules Regulating The Florida Bar. We impose this length of suspension because of the seriousness of the violations which were proven.
The discipline we impose here is the discipline we imposed in Florida Bar v. Tauler, 775 So.2d 944, 949 (Fla.2000). In Tauler, the ethical violations gave rise to a presumption of disbarment. We found that the presumption was overcome by the mitigation evidence demonstrating Tauler's proven commitment to providing legal services to those in need. Here too Dove has demonstrated a commitment to providing legal services to those in need. Dove's contributions as a lawyer, particularly her work in dependency cases and as an advocate for Florida Legal Services, mitigate against disbarment.
Accordingly, based on the facts, rule violations, and case law, we conclude that *1011 the referee's recommendation of a public reprimand is not supported and impose a three-year suspension.
The Bar has also asked the Court to modify the referee's recommended probation, asserting that the recommended conditions of probation are not feasible. As we have determined that a three-year suspension is appropriate, we disapprove the referee's recommendation of probation in its entirety.
Turning to Dove's petition for review, Dove argues that the Bar should be required to maintain a disciplinary index of sanctions, which she envisions as a list of appropriate sanctions for each rule violation. Dove claims that she is prejudiced by the lack of such an index. We find this argument is completely without merit. The Rules Regulating the Florida Bar, the Standards for Imposing Lawyer Sanctions, and the opinions issued by this Court inform attorneys of what conduct is required of them and what sanctions might be imposed for various forms of misconduct.
Next, Dove challenges the referee's recommendation that Dove reimburse the Bar's costs in the amount of $14,057.63 and disgorge the fees from the adoption case in the amount of $8,388.84. We agree with Dove that the referee erred in recommending that Dove disgorge fees in the amount of $8,388.84 to The Florida Bar Foundation.[9] The Foundation is a statewide organization that provides financial support for legal aid and promotes improvements in addressing the civil legal needs of the poor. Although these are significant goals, the clear language of Rule Regulating the Florida Bar 3-5.1(h) only permits disgorgement to the Client Security Fund. The Florida Bar Foundation is not mentioned in the rule. In addition, rule 3-5.1(h) and disgorgement do not apply to this case. Although Dove provided inadequate service to her clients, the $8,388.84 was not a prohibited fee, an illegal fee, or an excessive fee as required by rule 3-5.1(h). See Fla. Bar v. St. Louis, 967 So.2d 108, 123-24 (Fla.2007). The civil malpractice action instigated by the adoptive parents was the appropriate remedy in this situation, not disgorgement. Thus, there is no basis under rule 3-5.1(h) to require Dove to disgorge $8,388.84, and the referee's recommendation of disgorgement seems to be in the nature of a fine. Fines are not permitted in disciplinary cases. Fla. Bar v. Frederick, 756 So.2d 79 (Fla.2000). Since the referee's recommendation is not permitted under rule 3-5.1(h), we disapprove the recommendation for disgorgement.
With regard to the Bar's costs, Dove argues that the costs taxed to her should be reduced because she was not found guilty of some rule violations. Rule Regulating the Florida Bar 3-7.6(q)(2) provides that the "referee shall have the discretion to award costs and, absent abuse of discretion, the referee's award shall not be reversed." This Court has repeatedly upheld rule 3-7.6(q)(3), which provides that when "the bar is successful, in whole or in part, the referee may assess the bar's costs against the respondent." Ethical Florida Bar members should not unnecessarily bear the cost of prosecuting the misdeeds of unethical members. There is no authority to support Dove's argument for a percentage system in bar discipline cases. In this case, the referee examined the Bar's submissions and found that the Bar reasonably incurred $14,057.63 in costs. Accordingly, since the Bar was successful in this case, we approve the referee's award of costs to the Bar.

*1012 CONCLUSION
Joyce Sibson Dove is hereby suspended from the practice of law in Florida for three years and thereafter until she proves rehabilitation. The suspension will be effective, nunc pro tunc, May 28, 2007, the effective date of the discipline that this Court imposed in its April 27, 2007, order. Fla. Bar v. Dove, Nos. SC05-302 & SC05-1157, 968 So.2d 558, 2007 WL 1486096 (Fla. April 27, 2007) (unpublished order). As Dove is currently suspended, she does not need thirty days to close out her practice and protect the interests of existing clients. Dove shall accept no new business until she is reinstated to the practice of law in Florida.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Joyce Sibson Dove in the amount of $14,057.63, for which sum let execution issue.
It is so ordered.
WELLS, ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, C.J., dissents with an opinion.
PARIENTE, J., dissents with an opinion.
LEWIS, C.J., dissenting.
Although the majority attempts to soften the facts of this case, the findings of fact by the referee are clear and revealing of the egregious behavior with which we are faced.[10] The majority also overlooks, which I cannot, the testimony from those who worked in Dove's office stating that, while not charged in this case, this type of conduct and concealment was not unusual.[11] I cannot join my esteemed colleagues in imposing discipline less than disbarment. I suggest that the imposition of only a suspension under these egregious circumstances undermines professionalism, creates fertile ground for public distrust, and constructs unjustifiably lenient precedent that we will regret in the future because it fails to properly protect the vulnerable children and families of Florida. We do not hesitate to disbar for the theft of money but apparently we do not cloak the family structure and vulnerable individuals with that same sense of protection. Further, the relevant facts, binding precedent, the Florida Standards for Imposing Lawyer Sanctions, and the aggravating and mitigating factors present in this case indicate that the proper sanction for Dove is disbarment. In my view, this case is among the most flagrant cases of lawyer misconduct that this Court has ever reviewed. Nevertheless, the majority merely imposes a suspension by discounting the rather large shadow cast by our prior, binding precedent which indicates that Dove's conduct warrants disbarment. Therefore, in fidelity to prior precedent and to my conscience, I must dissent.
The facts are simple. The unfortunate events that bring us here today were generated by a boyfriend of a vulnerable single mother. However, the Boyfriend was not the biological father of the child. During the proceedings before the referee, it was disclosed that when the Birth Mother originally discovered that she was pregnant, the Boyfriend pressured her to give Baby Z up for adoption. When the Birth Mother refused, the Boyfriend kicked her out of the apartment they were then sharing. The Birth Mother kept Baby Z and *1013 returned home to live with her parents (i.e., the maternal Grandparents). The Birth Mother eventually resumed dating the Boyfriend, and he correspondingly renewed his pressure tactics to convince the Birth Mother to give up Baby Z. When the Birth Mother moved into her own town-home, the Boyfriend followed. It was at that time that he contacted an "adoption hotline." The referee specifically found that the Boyfriend, not the Birth Mother, called the "adoption hotline." It was immediately disclosed that the Birth Mother and Baby Z had resided with the Grandparents from the baby's birth on November 26, 2001, until these events began to unravel (i.e., for a period greater than six months in duration), which vested the Grandparents with a protected, priority adoption status, and an entitlement to notice of the termination-of-parental-rights and adoption proceedings.[12]See §§ 63.0425(1), 39.801(3)(a)(5), Fla. Stat. (2002);[13]see also, e.g., In re X.Z.C., 747 So.2d 1006, 1006-07 (Fla. 2d DCA 1999) ("Section 63.0425, Florida Statutes (1997), provides that a grandparent be provided with notice when his or her grandchild is placed for adoption if the child has `lived with' the grandparent for at least six months.... [W]e conclude that the term [`lived with'] is not ambiguous and should be afforded its plain meaning. The statute only requires that the child live with the grandparent for at least six months. It does not require that the child reside `solely' with the grandparent in the grandparents' residence." (citation omitted) (emphasis supplied)).[14] In fact, when the adoption "professionals" arrived to take Baby Z, the Birth Mother was required to drive to the Grandparents home to retrieve the baby, and Dove's agents knew that this care arrangement was not some unusual, isolated incident.[15] This "pick-up" constituted *1014 the Grandparents' first notice that the family was in jeopardy. Deborah O'Reilly, Dove's paralegal, who was given the responsibility of retrieving Baby Z, and whom Dove explicitly claimed was a "neutral witness," testified that the maternal Grandfather followed the Birth Mother back to her townhome and O'Reilly met him on the sidewalk as he was screaming that Dove's agents could not take the baby; they nevertheless removed Baby Z. O'Reilly continued, stating that the Grandfather "was very angry." He screamed all the way down the street as he followed the car. He was screaming "don't take my baby. That's my grandson." (Emphasis supplied.)
After Dove's agents removed Baby Z, the Grandfather returned home and called the Grandmother who was at work. The Grandfather testified that "[s]he just couldn't believe what happened. She was very upset." The Grandfather shared that when "she came home ... we started to cry, you know. We couldn't do much." (Emphasis supplied.) The Grandparents later contacted a few attorneys, but simply had no financial ability to retain counsel at that time. One of the attorneys gratuitously recommended that the Grandparents write Dove to explain their situation and advise her that, according to the Florida Statutes, since the child had lived with the Grandparents for over six months, they were entitled to formal notice and an adoptive first preference. Sadly, the Grandparents needed over a year to raise the $10,000[16] necessary to hire competent counsel to attempt to recover this child, but by that time, Dove had already deceived the circuit court through active misrepresentations into terminating the Biological Parents' parental rights and into granting a final adoption concerning Baby Z.
Despite their lack of funds, these desperate Grandparents contacted Dove on at least twenty occasions through letters and phone calls. On one such occasion, the Grandfather called Dove's office and actually spoke with her. He asked her when he would see his grandson again, to which Dove responded with a soul-crushing "NEVER," and hung up the phone. The Grandfather further testified that he wrote Dove, explaining that he and the Grandmother were the grandparents of Baby Z, that the baby had lived with them for over six months, and that according to the Florida Statutes they should have had first preference in the adoption proceedings. Dove never responded to this catalogue of communications. Contrary to the opinion of the majority, the referee's written findings do not support the contention that Dove failed to respond "[b]ecause the grandparents indicated that they were represented by a lawyer." Majority op. at 8. Rather, the referee, without elaboration, found that "[Dove] instructed her employees to not communicate with the Grandparents and to only take messages when they called. [Dove] did not return the calls." Deborah O'Reilly testified that the feeling in the office was that Dove ignored the Grandparents' communications and *1015 "was just waiting until the adoption was final." Further, the referee found that Dove found herself in a race against time and that the "time urgency convinced [Dove] of the need to go ahead and file with the factual errors in the petition."
In the face of what eventually amounted to a veritable mountain of evidence, Dove finally stipulated before the referee that Baby Z in fact resided with the Grandparents from his birth in November of 2001, and that he resided there for more than six months. Dove further stipulated that the Grandfather "was a very attentive grandfather, would take his grandson for walks ..., [and] would care for the child during the day when the [Grandmother and the Birth Mother] were at work." Dove's agents were all well aware of this long-term de facto custody arrangement and were also provided the name of the Biological Father.
Notwithstanding this bank of information, the child was removed to a distant venue in Leon County, away from those interested blood relatives, and adoption proceedings were initiated and conducted  based on false statements and deception  as though the child had no connected or interested biological family. The appropriate sanction for Dove's egregious misconduct in this misdirection of justice is disbarment. Dove's misdeeds reach directly into the homes of the individuals impacted by this case and have damaged everyone involved, including Baby Z. This misuse of power and the abuse of the privilege entrusted to an attorney is one of the most atrocious acts of misconduct imaginable.
Dove also ignored and sought to surreptitiously avoid the Birth Mother's attempt to withdraw her consent to the adoption and the clear attempts of the Grandparents to assert their rights to their grandchild. Under Florida law, the Grandparents clearly possessed statutorily created rights with regard to the adoption of this grandchild. See § 63.0425(1), Fla. Stat. (2002); B.B. v. Dep't of Children & Families, 854 So.2d 822, 827 (Fla. 1st DCA 2003) (citing L.R. v. Dep't of Children & Families, 822 So.2d 527, 531 (Fla. 4th DCA 2002)). In this case, the Grandparents specifically provided Dove with express written notice that they desired and intended to invoke their statutory rights. Dove knew that Baby Z had resided with the Grandparents in their home for at least six months. She just chose to misrepresent these facts to the courts. Dove had received a letter postmarked August 24, 2002, in which the Grandparents asserted their claim for priority because the child had resided with them in their home for six months. Notwithstanding that letter and notice, Dove ignored and attempted to avoid the Grandparents and did not even inform them of the jurisdiction and venue in which the adoption proceedings had been filed; moreover, Dove did not advise the circuit court of these facts. Cf. § 63.135(1)(c), Fla. Stat. (2002) ("Each party in an adoption proceeding involving a child over the age of 6 months, in the first pleading or in an affidavit attached to that pleading, shall ... declare under oath whether ... [t]he party knows of any person not a party to the proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child."). Although Baby Z actually resided in Central Florida near Orlando, Dove removed Baby Z from that venue and filed all legal proceedings in Tallahassee, Leon County, a distant location from the Grandparents and the venue in which the child resided with them. Based on section 63.087(4)(a), Florida Statutes, the proceedings would have been in Orange or Seminole County. See §§ 63.087(4)(a)1., (4)(a)4., Fla. Stat. (2002). Further, the Grandparents had a right to *1016 be notified of the adoption proceedings by the "adoption entity" in which Dove was intimately involved and which she was controlling. This was also Dove's direct responsibility as counsel. See § 63.0425(1), Fla. Stat. (2002). The Grandparents only began their search with the courts located in Tallahassee because Dove's adoption agency and law practice were located there, and the Birth Mother had informed the Grandparents that the Adoptive Parents lived in Tallahassee, which also turns out to have been inaccurate information (the Adoptive Parents do not reside in the State of Florida). The Grandparents also directed correspondence to two Leon County judges, in which they explained who they were and what they wanted. These judges never read the letters because the Grandparents were not formal parties in the proceedings. The Grandparents were unfamiliar with the legal system and could not afford to hire counsel at that time. Dove, however, owed a duty of candor to the tribunal and she knew all of the pertinent facts; she merely concealed them to expedite this adoption.
Additionally, at no time while Dove was manipulating this scheme did the Biological Father abandon any of his rights as a father. Dove worked diligently to prevent the father from interfering with her economic interest and this outrageous plan for Baby Z. In the initial meeting with the Birth Mother, the mother specifically identified the Biological Father by name, clearly disclosing that the person who called the "hotline" was not the Biological Father. Before the referee, Dove even admitted that she knew the identity of the Biological Father. Even though Dove had the true facts, she filed a "Petition For Custody Of Minor Child" on July 19, 2002, stating that the "birth mother of this child has surrendered her parental rights by affidavit, and named a legal father. The legal father has surrendered his parental rights by affidavit." Cf. §§ 63.062(1)(d)3., 63.062(6), 63.088(2), Fla. Stat. (2002) (mandating that the petitioner conduct a good faith, diligent search and provide proper notice of a petition to terminate parental rights to a known, locatable biological father who has not executed a consent or affidavit of nonpaternity). At no time, however, did Dove file an affidavit from either the Biological Father or anyone else providing consent for someone to adopt Baby Z. Indeed, she had access to the information that the Biological Father had not surrendered any parental rights.
Further, on October 1, 2002, the Birth Mother's father (the Grandfather) faxed a letter to Dove which was executed by the Biological Father on September 30, 2002, in which the Biological Father identified himself as the biological father of Baby Z, stated that the child was obtained by Dove's adoption agency from the Birth Mother without the Biological Father's approval, and declared that he wanted to stop the adoption proceedings. Dove concealed this communication of the Biological Father from the circuit court and never disclosed the true facts. Cf. § 63.135(1)(c), Fla. Stat. (2002).
The Biological Father was entitled to notice and his consent to the adoption was required. See §§ 63.062(1)(d)3., 63.062(6), 63.088(2), Fla. Stat. (2002). Thus, Dove was obligated to obtain the Biological Father's consent to the adoption or, alternatively, obtain an affidavit of nonpaternity in lieu of consent. Nonetheless, Dove decided to act deceptively with complete disregard for the Biological Father's rights. It is undisputed that the Biological Father was never served with notice of the proceedings to terminate parental rights pending adoption, even though he was a known, locatable biological father.
*1017 Notwithstanding their continuous efforts to prevent Dove's actions, the maternal Grandparents were unable to thwart Dove's success in obtaining a termination of parental rights and a final adoption with regard to Baby Z. Not fully understanding their legal rights, and lacking the funds necessary to hire competent counsel to represent them, the Grandparents resorted to writing letters and filing complaints with The Florida Bar and the Department of Children and Families. The Grandfather hoped that filing these complaints would save the child. The Grandparents never received any notice of the hearings in the termination-of-parental-rights or adoption cases. Cf. §§ 63.0425(1), 39.801(3)(a)(5), Fla. Stat. (2002); In re X.Z.C., 747 So.2d at 1006-07.
The Grandparents eventually saved enough money to retain counsel to seek the return of their grandchild. Counsel explained to them that the adoption had already been finalized and that the child was no longer residing in Florida, but had been moved to a different state. At this time, what the Adoptive Parents described as their "worst nightmares" began to occur. Although Dove initially offered the Adoptive Parents such insightful advice as, "the [G]randparents weren't happy but there was really nothing that they could do about [the situation]," the Adoptive Father later received a phone call from Dove, who asked him if a sheriff had approached the Adoptive Family, as the Grandparents had filed a petition for a writ of habeas corpus. (Emphasis supplied.)
Dove's deceitful actions eventually forced the Adoptive Parents to hire a new attorney and litigate for over a year to retain Baby Z. According to the Adoptive Father, new counsel "said originally [that] she thought [the case] look[ed] sloppy and then noticed that very important papers were actually missing." The adoption-dispute litigation between the Biological and Adoptive Families eventually settled when both parties, unlike Dove, were able to set aside their personal interests to further the best interests of the child. When questioned about the desirability of the resulting open adoption and limited visitation rights in favor of the Biological Family, the Adoptive Father testified that an open adoption
was the last thing I wanted.... And towards the end of the [adoption-dispute] case, when [our new attorney] started to suspect that fraud on the court could be proven, she said it just wasn't a risk that we needed to take, that there was enough that there was a possibility that we would lose [Baby Z]. And so we really had no choice but to  we felt we had no choice but to mediate.... [A]s we got into the [adoption-dispute] case, we realized that this had been going on from a couple of days after we actually [picked up Baby Z]. And, ... though [Dove] mentioned that on the final adoption, she led us to believe that once that adoption was signed, we were finished, and that [the situation with the maternal Grandparents] would never come back again. And as it continued after the final adoption, we should have been informed  I should have had the opportunity to get a new attorney, and to make this  ... to never get to the point where a habeas corpus [writ] would come to me.
(Emphasis supplied.) Similarly, the maternal Grandfather characterized the open adoption as a last resort for the good of the child and stated that "[i]t was [the Grandparents] desire all the time ... that [they] adopt the child."
The Adoptive Parents were also forced to file a malpractice action against Dove to recover the $15,000 adoption fee that they *1018 had paid her. Dove only returned $5,000 of her fee (her deductible), while her insurance company was forced to cover the additional $10,000. Consequently, Dove did not even return the entire fee; she was compensated. Additionally, Dove had the audacity to state before this Court that "[i]t wasn't my fee. It was the agency." (Emphasis supplied.) Dove's agency board consisted of the following individuals: herself, her husband, her daughter, her mother (who lives in Massachusetts), her former paralegal, and a family friend and colleague who lives in Oregon. Further, both Ms. Flemming and Ms. O'Reilly testified that Dove controlled every aspect of her foundation, her adoption agency, and her law practice, and that all three entities functioned as one whole.[17] Thus, contrary to Dove's assertions, the $15,000 she charged the Adoptive Parents was "her fee."[18]
The greed and self-interest exposed by the conduct of this lawyer strike at the very heart of American values  our families and our children. I rhetorically ask  how can such intentional actions, which included repeated misrepresentations and misleading a circuit court judge, and the abuse and misuse of the justice system to actually harm families, merit merely a suspension? It is an embarrassment to the disciplinary system and an affront to the public that these deliberate and blatant misdeeds of the theft and sale of a child have not resulted in the disbarment of Dove.
Dove has crushed all families touched by the adoption proceeding. She has inflicted permanent harm upon the Birth Mother, the Biological Father, the Grandparents, the Adoptive Parents, and Baby Z himself  all for a "fist full of dirty dollars." The referee even recognized that Dove used an agent to offer a discounted adoption in this case and then "raced" to secure her fee. There were, and will continue to be, unnecessary strains and pains placed on the shoulders of these good people, all so that an attorney could be enriched. I say this is outrageous, and I believe our prior case law and the standards of this society support my position  even though my learned colleagues do not agree. The deceitful, false acts of this lawyer before the circuit court and the fraud she perpetrated upon these families has drawn innocent, good people into an emotional and legal fray that they did not seek and do not deserve.
We speak so often that the justice system is designed to protect children, but our action today demonstrates that we are unwilling to support our words with appropriate action, even though in the past, this Court has taken the proper step  disbarment  in comparable misrepresentation cases. See, e.g., Fla. Bar v. Salnik, 599 So.2d 101, 102-03 (Fla.1992) (disbarring attorney for using an out-of-town judge's *1019 signature stamp to convert two copies of a proposed final judgment into two forged final judgments, despite the presence of "several mitigating factors," and despite the fact that "no one was injured by [the attorney's] actions." (emphasis supplied)).[19] Judges and attorneys are officers of the court who are bound by duties of candor and professionalism. In family-law cases, these judicial officers are entrusted to do that which is proper for the care of our children. The standard is "the best interest of the child." See B.Y. v. Dep't of Children & Families, 887 So.2d 1253, 1256 (Fla.2004) ("The courts are charged with the duty of ensuring that the best interests of the children are advanced. This duty exists during the dependency proceedings, and continues through the adoption proceedings." (citations omitted)); see also § 63.022(2)(1), Fla. Stat. (2002). This applies to both biological families and those families that step forward to provide loving care for children. However, misconduct such as that discovered in this circumstance operates to threaten the sanctity of these families, especially when disbarment does not result. Dove's actions, in my view, are the antithesis of everything we stand for in providing safe, loving, and protective conditions in which to nurture and raise our children. Dove has created emotional pain and suffering for the families and Baby Z, and all those who love him, beyond my comprehension.
This Court has disbarred attorneys who have committed similarly intolerable acts of deception, while enunciating a general rule that applies under these circumstances: "This Court typically imposes the severe sanction of disbarment on lawyers who intentionally lie to a court. An officer of the court who knowingly seeks to corrupt the legal process can expect to be excluded from that process." Fla. Bar v. St. Louis, 967 So.2d 108, 123 (Fla.2007) (emphasis supplied) (citing Fla. Bar v. Kickliter, 559 So.2d 1123 (Fla.1990) (disbarring attorney who committed a fraud on the court); Fla. Bar v. Agar, 394 So.2d 405 (Fla.1980) (disbarring attorney who solicited false testimony, thereby allowing his client to perpetrate a fraud on the court)) (emphasis supplied). I find myself wondering why the majority has not followed and applied this general rule, which applies with particular force to the facts of this case: an attorney proceeded to seek an adoption of a baby while misrepresenting material facts to the circuit court to obtain her desired result, while also avoiding disclosure and offering outright falsehoods to all involved for the purpose of "covering her tracks."
What is also disturbing is that Dove has had the audacity to contend that all of her reprehensible behavior was legally justified or, at a minimum, the result of "good faith lapses as opposed to an intent to defraud the [circuit] [c]ourt or deceive any individual." At every opportunity the referee presented for her to accept responsibility for her actions, Dove argued that everyone but her was to blame. The following represents merely a sampling of the remarkably bold explanations Dove offered for her behavior before the referee. "[Y]ou have the grandparents misleading... making phone calls under assumed names, there's no trust there." This derisive assertion ignored the obvious fact that the Grandparents were forced to resort to these tactics because of Dove's two-pronged, clandestine strategy to (1) keep the Grandparents uninformed and (2) to subvert the termination-of-parental rights *1020 and adoption proceedings. Dove even repeated this explanation before this Court during oral argument. Dove continued by stating that she "didn't have notice until after August 21[, 2002] that there was a six-month issue." The referee specifically found otherwise; moreover, this excuse does not account for Dove's blatant concealment and misrepresentation of this fact before the circuit court. Dove
regret[ted] [the Grandparents] didn't have enough money to hire a lawyer. [However,] [t]hat is not a unique circumstance in litigation in Florida. A lawyer does not pull her punches or handle her case differently because the adverse party has had access to counsel and has not hired them for whatever reason. That's the situation here.
This type of contention simply cannot be used to attempt to excuse Dove's intentional misrepresentations to the circuit court. Further, the Grandparents were not parties, adverse or otherwise, to any action against Dove or her clients at that time, and Dove had an obligation to consider the best interests of the child, who had an established, loving relationship with his Grandparents, as she conceded before the referee. In a further attempt to avoid responsibility for her deceptive tactics, Dove contended that the Mississippi attorney she hired to locate the Biological Father "dropped the ball." The referee based on competent, substantial evidence found otherwise:
[Y]ou had proceeded with the termination of parental rights and on the same day you were starting your search for the father so, therefore, your search for the father was nothing in my opinion but a sham. Whether [the Mississippi attorney] was successful or not is totally immaterial because you had already terminated [the Biological Father's] rights ..., you had gotten a judge to terminate his [parental] rights.
(Emphasis supplied.)[20]
Dove also blamed the court system for her misrepresentations. Specifically, she stated that the circuit court lost the required petition to terminate parental rights and the required UCCJA affidavit. The referee specifically found otherwise. Continuing her parade of excuses, Dove contended that the Biological Father was not entitled to notice under chapter 63, Florida Statutes (2002). However, the Biological Father was clearly entitled to notice under section 63.062(1)(d)(3), Florida Statutes (2002), because the Birth Mother specifically identified him as the biological father of Baby Z. Similarly, despite the fact that the Birth Mother openly declared the identity of Baby Z's biological father during the initial meeting with Dove's representative on July 17, 2002, Dove asserted under oath that "[t]he circumstances are that we are not sure who [the biological father] is at the time that this is going on." Further, Ms. O'Reilly testified that the Birth Mother's boyfriend "was not the father. He was very adamant about that. He told us that."
Dove also blamed her employees  she pointed to Ms. Flemming as the individual responsible for the lack of communication with the Adoptive Parents despite the fact that Flemming testified that she had little to do with this case and despite the fact that the Adoptive Father testified that he dealt primarily  if not exclusively  with Dove. Never one to end a game of charades prematurely, Dove then attempted to hide behind the adoption entity, which *1021 she controlled, by arguing that it, not she, was responsible for sending notice to the Grandparents before the pending adoption occurred. Dove also maintained that no one could "argue to [the referee] with a straight face that the grandparents did not have notice that at least adoption proceedings were ongoing," and that the Grandparents possessed actual notice of these proceedings. Dove offered this argument while knowing that the Grandparents were only aware of the bare fact that child had been taken by an adoption agency. The Grandparents  immigrants to this county, who are unfamiliar with our legal system  were forced to resort to their own detective work to discover the name and location of the circuit court that Dove was then manipulating.
The list continues: Dove contended that even though her office received numerous communications from the Grandparents demanding information about their grandson and asserting their rights to the child, "[i]t wasn't communication with [her]." In opposition to the adoption statutes then in effect, and case law interpreting those statutes, Dove contended that "the grandparents' objections were never timely and they never had standing to object to the adoption." Finally, during closing, Dove's counsel asserted that
[m]y client has acknowledged if she had to do it over again, she would do it differently. I think that's as close as you can get to a tangibly expressed element of remorse.... At worst [what Dove did] was expedient. At worst it was trying to put an adoption through quickly.... Proof of rehabilitation ... will accomplish what? I submit the rehabilitation has already taken place.
(Emphasis supplied.) In response, the referee found otherwise, "I heard you, [counsel for Dove], request that the errors be mistakes, I find that the lack of candor to a tribunal with respect to the falsehoods did have the intent to defraud and is major." (Emphasis supplied.) Further, what the majority views as dispositive evidence of mitigation is simply not as strong as it contends. And even if it were, under our precedent, even strong mitigation would not serve as a good-deed "piggy bank" to offset the enduring grief Dove has caused the Adoptive and Biological Families. See, e.g., Fla. Bar v. Korones, 752 So.2d 586, 591-92 (2000) ("Prior commendable acts cannot exonerate an attorney from the discipline that must be imposed for intentional, egregious ethics violations, such as those which have occurred in the instant cases. Therefore, despite [the attorney's] attempted reliance upon remorse, financial and familial difficulties, health problems, good reputation, and restitution to the beneficiaries, we conclude that disbarment is the discipline that must be imposed." (emphasis supplied)); Fla. Bar v. Travis, 765 So.2d 689, 691 (2000) ("Though we commend the past good works that [the attorney] has performed, we expressly hold ... that such good works do not overcome [the attorney's] pattern of conduct in which he intentionally misappropriated client funds for his own use. We again expressly state for the benefit of the members of the Bar that stealing from a client ... cannot be overcome merely because the attorney has committed prior good works and has no prior disciplinary history. An attorney does not perform such good works so that they can be used as a credit against such severe misconduct." (emphasis supplied) (citations omitted)). The theft of a child does not merit a less severe censure than the mere theft of material wealth or currency.
In the seminal case addressing the general rule of disbarment concerning intentional misrepresentations to a court  Dodd v. Florida Bar, 118 So.2d 17 (Fla. *1022 1960)  this Court eloquently expressed the rationale and utility of this precept of attorney professionalism:
When an attorney adds or allows false testimony to be cast into the crucible from which the truth is to be refined and taken to be weighed on the scales of justice, he makes impure the product and makes it impossible for the scales to balance.

No breach of professional ethics, or of the law, is more harmful to the administration of justice or more hurtful to the public appraisal of the legal profession than the knowledgeable use by an attorney of false testimony in the judicial process. When it is done it deserves the harshest penalty.

Id. at 19 (emphasis supplied). This is especially true in a case such as this, in which a trial court relied on the accuracy of an attorney's ex parte factual, substantive, and material representations in rendering its decision as to the familial structure of a vulnerable, defenseless child. Tellingly, in Dodd, this Court disbarred an attorney despite the fact that the disciplinary case on review represented the attorney's first instance of professional misconduct. See id. at 18-19. The attorney had proffered false testimony with regard to expense items in a personal-injury case, and this Court held that intentionally misrepresenting material facts to a court warrants disbarment. See id. at 18-19; id. at 19-21 (Terrell, J., concurring). "Dishonesty and a lack of candor cannot be tolerated by a profession that relies on the truthfulness of its members"; thus, disbarment is the proper discipline when an attorney intentionally misrepresents material facts to a court or intentionally presents false testimony. Fla. Bar v. Budnitz, 690 So.2d 1239, 1240 (Fla.1997) (emphasis supplied) (reciprocal discipline decision disbarring attorney for misrepresenting the dating and notarization of a document during a grand-jury proceeding) (quoting Fla. Bar v. Graham, 605 So.2d 53, 56 (Fla.1992)).
Continuing this line of precedent, in Florida Bar v. Agar, 394 So.2d 405 (Fla. 1980), this Court overruled the referee's recommended four-month suspension and instead imposed disbarment in a case in which an attorney requested that a witness present false testimony during an uncontested divorce proceeding despite the fact that none of the parties were injured by this falsehood. See id. at 405-06. The Court quoted Dodd in support of "the general rule of strict discipline against deliberate, knowing elicitation or concealment of false testimony." 394 So.2d at 406. Here, Dove's intentional misrepresentations and concealment of pertinent facts directly led to the circuit judge's approval of the termination of parental rights and the ultimate approval of Baby Z's adoption, thereby substantially injuring the integrity of our judicial system and each party involved in this case. Therefore, as this Court held in Dodd, and in many other similar cases, the attorney's intentional misrepresentations merit "the harshest penalty"  disbarment. Dodd, 118 So.2d at 19 (emphasis supplied); see also Kickliter, 559 So.2d at 1123-24 (disbarring attorney for committing fraud on the court through the submission of a will for probate that contained a forged signature; the Court disbarred the attorney despite "substantial mitigation" (emphasis supplied)); Fla. Bar v. Merwin, 636 So.2d 717, 718-19 (Fla.1994) (disbarring attorney for lying to a judge with regard to the status of his case and the status of his client); Fla. Bar v. Rood, 620 So.2d 1252, 1253-55 (Fla.1993) (disbarring attorney for misrepresenting to a trial court and to a disciplinary referee the nature of a land deal); Fla. Bar v. Rightmyer, 616 So.2d 953, 954-55 (Fla.1993) (disbarring attorney  despite six independent mitigating factors  for misrepresenting the *1023 nature of a payment in a civil mortgage-foreclosure suit). This binding precedent plainly supports disbarment in the instant case. Why then does the majority choose to impose a mere suspension? Are we more concerned with economic misbehavior than with damage to our children and families? See Fla. Bar v. Gross, 896 So.2d 742, 745-48 (Fla.2005) (attorney disbarred for repeatedly misappropriating client trust-account funds and violating other Bar rules such as forging client's signature); Fla. Bar v. Spear, 887 So.2d 1242, 1245-48 (Fla.2004) (attorney disbarred for transferring $75,000 of a client's funds from the trust account and obtaining a loan from another client to repay the first client); Fla. Bar v. Massari, 832 So.2d 701, 704-07 (Fla.2002) (attorney disbarred for fraudulently obtaining a client's settlement funds, misappropriating $30,000 of those funds, and committing fraud in an attempt to conceal his misconduct).
Before the circuit court, Dove purposefully concealed substantive, material, and vital information. She then stood before this very Court, during oral argument, and admitted that she made these misrepresentations. It is incomprehensible to me that such misdeeds and false statements, which directly inflicted extensive damage to a child, those around him, and to our legal system merit only a suspension. "`Lawyers are officers of the court and they are responsible to the judiciary for the propriety of their professional activities.' In taking the oath of admission to the bar one must swear to `never seek to mislead the Judge or Jury by any artifice or false statement of fact or law.'" Kickliter, 559 So.2d at 1124 (emphasis supplied) (quoting the preamble to chapter 4 of the Rules Regulating the Florida Bar).
It is crucial that we recognize that fine attorneys often assist families with the adoption process by serving pro bono. That service is something members of The Florida Bar are privileged to provide. As officers of the court, we demonstrate our love and care for children, families, and our communities by enriching their lives, and our own, by voluntarily doing good for others, without profiting, even though costs may be incurred. In my view, Dove's actions are directly contrary to everything we should stand for as attorneys who have the privilege to be part of the judicial system and to act as officers of the Court. Despite Dove's claims of past social contributions,[21] the actions we review were not a mistake. Dove intentionally constructed her adoption agency and used that edifice to further her efforts to force this adoption to take place through her acts of misrepresentation and concealment of substantive, material facts. She has full knowledge of how the adoption process is intended to operate, as evidenced by her many years of legal experience and by her positions with her creations, the Foundation for Children, Inc., and the Foundation for Children Adoption Agency, which comprised *1024 the adoption web in which these good people were trapped.
Further, in light of these positions and the record, it is apparent that Dove's claims that she was merely acting at the direction of the Agency or Corporation are disingenuous at best and additional evidence of reprehensible conduct at worst. See Fla. Bar v. de la Puente, 658 So.2d 65 (Fla.1995) (disbarring attorney for several instances of misconduct, including making a false statement to the tribunal during the disciplinary proceedings). In my view, the arguments she presented before this Court are simply further efforts to mislead this Court. Dove was the director and president of the corporation, Foundation for Children, Inc., which operated the Foundation for Children Adoption Agency. Dove was also the director of the Agency. In addition, she was legal counsel for both the Corporation and the Agency. The State public records are open for all to see.
Dove made additional misrepresentations before this Court. During oral argument, Dove repeatedly asserted that she viewed the Boyfriend as the "legal father" because he was caring for Baby Z and acting like a true father. Not only is this a misdirected legal argument, but it is false and contrary to the facts established before the referee, because the record indicates that the Boyfriend was involved only as a source of problems. The Boyfriend forced the Birth Mother to move out of their domicile because she was hesitant to give Baby Z away and release him for adoption. The baby remained with the Grandparents, and this status was at all times open and obvious.
I submit that after reviewing these events in the adoption case, none of us would permit what happened to Baby Z and the families involved in the life of this child to happen to any of our own families and children. There simply is no reason to permit this to happen to other families by subjecting them to a lawyer's abuse of power. Dove was allowed the privilege of a license to practice law and to provide good counsel, and she has blatantly abused and misused that license and the trust that must be attached to that privilege. There is no genuine factual dispute here because everything has been admitted since the Bar and this Court exposed the true facts of this case.
As I examine the discipline imposed by the majority in light of the decisional structure that should have guided the imposition of attorney sanctions in this case  the facts of the instant case, the relevant case law, and the Florida Standards for Imposing Lawyer Sanctions  I simply cannot agree with the overly indulgent position of the majority. Dove's deplorable, deceitful behavior has been exposed in detail. I simply reiterate that she provided the circuit court and the parties with intentionally created, material falsehoods concerning the substantive and factual backdrop of the adoption of Baby Z, which severely damaged not only all involved but also our legal system. Furthermore, I suggest that the line of precedent endorsing and perpetuating the rule from Dodd should remain unbroken and should apply with exceptional force in this case:
No breach of professional ethics, or of the law, is more harmful to the administration of justice or more hurtful to the public appraisal of the legal profession than the knowledgeable use by an attorney of false testimony in the judicial process. When it is done it deserves the harshest penalty.
Dodd, 118 So.2d at 19 (emphasis supplied). Hence, all that remains is to examine disbarment through the lens of the Standards for Imposing Lawyer Sanctions to determine if those standards likewise require this potent sanction notwithstanding the *1025 referee's lenient imposition of a public reprimand and probation. Standard 3.0 states:
In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors:
a. the duty violated;
b. the lawyer's mental state;
c. the potential or actual injury caused by the lawyer's misconduct; and
d. the existence of aggravating or mitigating factors.
Here, Dove violated several duties to her clients, her duties to her profession, and her paramount duty of candor. Additionally, it is undisputed that she engaged in this conduct intentionally and with a deceitful motive. The injuries involved cannot be overstated: Dove directly accomplished the adoption of a powerless child through the use of artifice and deception directly contrary to the will of the Grandparents, the Biological Father, and later the Birth Mother.
With regard to mitigating factors, Dove presented five: (1) The absence of a prior disciplinary record; (2) Dove's purported lack of dishonest intent; (3) Dove's community service with regard to the Ukraine Project, the Guardian Ad Litem program, and other services that benefit children; (4) the circuit court's evaluation of recent cases with Dove demonstrating interim rehabilitation; and (5) Dove's remorse. However, the majority has already rejected one of Dove's five proffered mitigators: Dove intentionally acted in a dishonest, deceitful fashion contrary to the referee's findings. See majority op. at 1008. Further, precedent belies two more[22] of Dove's remaining mitigators: prior commendable acts cannot exonerate an attorney from the discipline that must be imposed for intentional and egregious ethical violations. See Rood, 620 So.2d at 1255 (disbarring attorney for misrepresentation to tribunal despite the attorney's "significant contributions to the legal community and to various charitable organizations" (emphasis supplied)).
Thus, Dove is left with only two material mitigating circumstances  (1) the absence of a prior disciplinary record and (5) remorse  both of which have previously been of little moment to this Court when disbarring attorneys for intentional, material misrepresentations that adversely affect the legal proceeding in a significant or potentially significant manner. See, e.g., Dodd, 118 So.2d at 18-19 (attorney disbarred for intentional misrepresentation to trial court despite the fact that he had no prior disciplinary record); Rightmyer, 616 So.2d at 954-55 (attorney disbarred for intentional misrepresentation to trial court despite six independent mitigating factors: (1) severe marital difficulties; (2) alcohol and psychological problems; (3) no financial harm to the parties; (4) admission of guilt and remorse; (5) good general reputation; and (6) no prior discipline other than a public reprimand). Additionally, I am suspect of the referee's finding that Dove has demonstrated anything remotely approaching true remorse. Regret for having been caught is not contrition.
Likewise, I do not agree with the majority's description of the "substantial mitigation" *1026 purportedly present in this case. With regard to the Ukraine Project, while Dove's humanitarian efforts are certainly laudable, Ms. Flemming, Dove's daughter, and Dove herself each described the "dual nature" of the Project. Dove used her presence in the Ukraine to conduct her international adoption business. Ms. O'Reilly similarly testified that Dove was not paid until an adoption was completed and that Dove became upset when her counselors did not secure adoptions. The Ukraine Project  a partial business venture  was the primary mitigation the referee relied upon below. With regard to Dove's lobbying efforts, she was compensated for her services, and the relevant witness's speculative opinion as to whether Dove was compensated at or below her lobbying market value is irrelevant.
Each mitigation witness Dove presented was wholly unaware of the type and extent of deceitful conduct Dove used to manipulate the proceedings before the circuit court. Kent Spuhler testified that he had no real understanding of what had occurred in this case:
All I understood from [Dove] was there were issues about whether the mother had provided information to the father.... [I][o]nly [understood] in a general sense. I did not go into the details of specifics. I certainly did not explore what the other side was raising.
And, rather ironically, Spuhler testified that Dove "is passionate about ... people being able to get fair treatment in our legal system." (Emphasis supplied.) Dove also offered Marcia Lynn Hilty-Reinshuttle and a sitting circuit court judge as mitigation witnesses, each of whom was equally unaware of the active, material misrepresentations Dove had perpetrated. After having been informed of Dove's actions, the Circuit Judge even stated that her opinion of Dove would have changed had she previously been aware of the facts of this case, and further added: "If that happened in any case I ever had with [Dove], I certainly would not be here today testifying in her behalf." The incongruity of this collective "mitigation" testimony was not lost on the referee:
It has been my experience that when there is an elephant in the room it is best to say there is an elephant in the room [rather] than ignore it.... [These witnesses] have gotten right up close to the issue of representation of the poor and disadvantaged and the [guardian ad litem] program, as we know, is interested in the best interests of the children. In this case the findings that I made are based upon a perception in my mind that Ms. Dove was actually thwarting people's rights to have an attorney.... To sit here and have these people say these things ... [t]here seems to be something missing somewhere. Similarly[,] with the guardian ad litem program, whose goal is the best interest of the child, there's been no questions about is it in the best interest of children that defective adoptions be done.

(Emphasis supplied.)
Concerning the majority's reliance upon Dove's work "for the Florida State University Florida Child Advocacy Center as a law student and after graduation," see majority op. at 12, Dove's relevant testimony reveals inherent contradiction and a misrepresentation as to the extent of her involvement with the Center. Dove initially testified that she remained active at the Center following graduation, but later contradicted that testimony by admitting that her association with the Center ended in 1992  the same year she graduated from Florida State and became a member of The Florida Bar. Furthermore, Dove participated in the Center as a certified legal intern, public-service fellow. She participated *1027 as part of her academic development as a law student. Many of Florida's law students participate as certified legal interns. See generally Rules Regulating Fla. Bar ch. 11. Hence, unless the majority is willing to view all law-student legal internships as a credit against future intentional and egregious ethical misconduct, Dove's law-school participation at the Florida State University Florida Child Advocacy Center is immaterial to these proceedings.
None of the mitigation present in this case rises beyond the type of mitigation we have previously held insufficient to overcome intentional, egregious ethical violations. See, e.g., Korones, 752 So.2d at 591-92; Travis, 765 So.2d at 691; Rood, 620 So.2d at 1255. It is irrelevant that those decisions involved material wealth and this decision involves a child. A child is far more valuable than mere chattels or real property. While I do not condone the behavior of the attorneys involved in the relevant cases, the cases relied upon by the majority are easily distinguishable. Florida Bar v. Cox, 794 So.2d 1278 (Fla.2001), did not involve the intentional misrepresentation of a material fact. Instead, a prosecutor misrepresented the name of a testifying confidential informant in an attempt to innocently protect her identity and only later discovered that this misrepresentation prevented the defendant from discovering potentially impeaching evidence concerning the confidential informant's previously unknown criminal record: "The referee found that [the prosecutor] believed [the confidential informant] had a clean criminal record and that the use of an assumed name for the witness would not be any impediment to justice in the case." Id. at 1281. Further, the type and extent of aggravating and mitigating factors were very different in Cox. The prosecutor had only one aggravating circumstance  her substantial experience in practicing criminal law. See id. Whereas, in mitigation, the prosecutor had no prior disciplinary record, lacked a selfish or dishonest motive, and made full and free disclosure during the proceedings. See id. Here, Dove acted selfishly and dishonestly, resisted the Bar's investigative efforts, and only tepidly admitted wrongdoing during the sanction hearing before the referee. Finally, Cox did not involve the theft of a child.
Florida Bar v. Tauler, 775 So.2d 944 (Fla.2000), is equally distinguishable. That decision involved an attorney who committed trust-account violations as the result of an "overbearing," emotionally abusive husband, whom the referee characterized as "the prime mover in the wrongdoings committed by" the attorney. Id. at 947. The referee and this Court also focused on the "severe financial hardship," and the potential loss of the family home, which was apparently the primary motivation for the husband's abusive behavior and the attorney's resulting trust-account violations. Id. at 947-48. In addition to substantial community and legal service, the Court also found that the attorney "had taken responsibility for her actions, and voluntarily stopped practicing law." Id. at 948. In contrast, here, Dove has largely blamed others for her behavior, and the referee found that Dove was motivated by "a race of time ... [C]an I get this done before the grandparents get an attorney[?] [C]an I get this done before the daddy gets an attorney[?] [C]an I get this done before the mama gets an attorney[?]" Unlike Tauler, who was motivated by familial strife, Dove's ultimate motivation was obtaining her $15,000 fee regardless of the repercussions for the families involved in this debacle of abusive legal representation. Respectfully, the majority is comparing apples to oranges in *1028 relying upon Cox and Tauler to support its imposition of a suspension in lieu of disbarment in the instant case.
I agree that the applicable Standard for Imposing Lawyer Sanctions is standard 6.11:
Disbarment is appropriate when a lawyer:
a. with the intent to deceive the court, knowingly makes a false statement or submits a false document; or
b. improperly withholds material information, and causes serious or potentially serious injury to a party, or causes significant or potentially significant adverse effect on the legal proceeding.
Standard 6.1, of which standard 6.11 is a subpart, includes a cascading level of culpability and injury: the higher the degree of scienter and the higher the degree of injury, the higher the level of professional sanction, and, conversely, the lower the degree of scienter and the lower the degree of injury, the lower the level of professional sanction. See Stds. Imposing Lawyer Sanctions 6.1, 6.11-.14. Thus, standard 6.12, which is also a subpart of standard 6.1 and outlines where suspension applies, is inappropriate since it does not encompass or address situations where the lawyer's misrepresentations cause "serious or potentially serious injury to a party, or cause[ ] significant or potentially significant adverse effect on the legal proceeding." Std. Imposing Lawyer Sanctions 6.11.b. Additionally, there are four aggravating factors present in this case: (1) Dove is a mature, experienced attorney; (2) she made several misrepresentations to the Court; (3) the Adoptive Parents and Baby Z were at Dove's mercy; and (4) Dove knew better because of her considerable experience in adoption proceedings.
In sum, both the referee and the majority's chosen sanctions[23] lack "a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions,"[24] in addition to not fully reflecting the nature and extent of Dove's intentional deception, which continued in part before this tribunal. Consequently, I dissent. The wrong message is transmitted by the decision today. I regret that I have failed the people of Florida due to my inability to help my good friends and colleagues fully understand the enormity of this wrong. Dove should be disbarred.

[APPENDIX: Report of the Referee  Factual Findings]

IN THE SUPREME COURT OF FLORIDA

(Before a Referee)
THE FLORIDA BAR,
 Complainant,
v.
JOYCE SIBSON DOVE,
 Respondent.

Case Nos. SC05-302, SC05-1157

TFB File Nos. 2003-00,282(2A), 2004-00,519(2A), 2005-00,001(2A)

REPORT OF THE REFEREE
This case involves an attorney's representation in an adoption case. Almost *1029 all of the information in that underlying case is confidential. Since it was virtually impossible to excise the file during an efficient hearing, the undersigned has sealed this file. Hopefully, this Report is written in a manner which will not require the Report to be sealed.[1]

I. SUMMARY OF PROCEEDINGS
On February 22, 2005, The Florida Bar filed a two count Complaint against Respondent  Case No. SC05-302.[2] On June 29, 2005, the Bar filed a second Complaint against Respondent  Case No. SCO5-1157.[3] The cases were consolidated. After several case management hearings, the case was tried on the issues of guilt.
At the conclusion of the Bar's case, Respondent moved for involuntarily dismissal of Count II of the initial Complaint. The motion was granted orally. Respondent also moved ore tenus for involuntarily dismissal of the second Complaint. The motion was denied. The motion was subsequently renewed. It was granted orally. Both dismissals were rendered on March 30, 2006.
As to the surviving Count, a dispositional hearing was held on March 29, 2006.
All items properly filed, including pleadings, recorded testimony, exhibits in evidence, and the report of referee, constitute the record in this case and are forwarded to the Supreme Court of Florida.

II. FINDINGS OF FACT

A. Jurisdictional Statement.
Respondent is, and at all times mentioned during this investigation was, a member of The Florida Bar, subject to the jurisdiction and Disciplinary Rules of the Supreme Court of Florida.

B. Narrative Summary of Case.
Having heard the testimony, considered the exhibits, been otherwise advised, and considered the candor and demeanor of the witnesses, I find:
Respondent was a shareholder and director of the law firm known as Joyce Dove, P.A. Respondent is director and president of Foundation for Children, Inc. The corporation operated an adoption agency known as "Foundation for Children Adoption Agency." Respondent was director of the Agency. Respondent is and was legal counsel for the Corporation and the Agency.
The Agency was retained by Adoptive Parents to assist them in the adoption of a child. On or about July 12, 2002, the live in boyfriend of Birth Mother called an adoption "hotline" to place Birth Mother's seven month old son, Baby Z, for adoption. [Emphasis supplied.] The "hotline" referred the call to Respondent's Agency. Respondent sent an independently contracted social worker to meet Birth Mother and obtain her signature on documents necessary to proceed with the termination of parental rights and subsequent adoption proceedings. The worker met Birth Mother at her home with her boyfriend five days after boyfriend's initial call.
One of the documents Birth Mother signed was a Mother's Interview Affidavit (Bar Exhibit 36). In this, affidavit, she stated that during the last twelve months she lived at ".... Oviedo, Florida," the *1030 home of her parents, Grandparents. It is uncontested that she and Baby Z had resided at the home Grandparents from birth, November 26, 2001, (Respondent Exhibit 13), until, at least, July 6, 2002. [Emphasis supplied.] Birth Mother testified that Baby Z did not move into the townhouse with her, but stayed at Grandparent's home. (Transcript page 329, line 24 and page 330, lines 6-8) The worker did not obtain a Uniform Child Custody Jurisdiction Act Affidavit.[4] [Emphasis supplied.]
During the initial meeting, Birth Mother advised the worker that Boyfriend was not the biological father of Baby Z. [Emphasis supplied.] Boyfriend executed an Affidavit of Non-paternity. (Respondent Exhibit 14, page 9) Birth Mother provided the name of Birth Father. [Emphasis supplied.]
On July 19, 2002, Respondent filed a Petition for Custody of Minor Child and other documents in the Circuit Court. (Bar Exhibit 15) This Petition states, "The birth mother of this child has surrendered her parental rights by affidavit, and named a legal father. The legal father has surrendered his parental rights by affidavit."[5]
On July 21, 2002, Respondent's agents, went to Birth Mother's home to pick up Baby Z. The child was not there; Birth Mother drove to Grandparents' home to retrieve him. (Transcript page 330, lines 6-8 and page 332, line 5) [Emphasis supplied.] That day was the first notice that either of the maternal Grandparents received of a contemplated adoption.
Immediately, the Grandparents (one or the other or both) began communicating with Respondent's office indicating they objected to the adoption and wanted to assert grandparental rights. [Emphasis supplied.] At times they pretended to be somebody else. They indicated they had retained a lawyer. Thereafter, Respondent was contacted by more than one lawyer on behalf of the Grandparents. However, no lawyer ever formally appeared on their behalf. The Grandparents even wrote to circuit judges without avail. [Emphasis supplied.]
Respondent instructed her employees to not communicate with the Grandparents and to only take messages when they called. Respondent did not return the calls. On July 25, 2002, Grandparents once again called Respondent's office and advised that Baby Z had lived with them for over 6 months and that they were, therefore, entitled to certain grandparent's rights. (Bar Exhibit 37)[6] [Emphasis supplied.]
On July 23, 2002, Respondent filed a Petition for Court to Accept the Intended Adoption Placement for Minor child. (Bar Exhibit 16) This Petition states, in part, *1031 "The minor child is currently residing with his birth mother for the purpose of adoption. The birth mother and legal father have surrendered their rights to this child, pursuant to chapter 63, Fla. Stat. (2001)." (Emphasis added.) Again, Respondent did not file an affidavit from either the birth father or the alleged "legal father"[7] allowing for termination of parental rights. [Emphasis supplied.]
On July 25, 2002, Respondent filed a Notice of Petition and Hearing to Terminate Parental Rights Pending Adoption without having actually filed a Petition for Termination of Parental Rights,[8] purportedly providing notice to the birth parents of the hearing scheduled for August 21, 2002, at 1:45 p.m. (Bar Exhibit 26) [Emphasis supplied.] In fact, Respondent failed to provide a copy of the Notice to Birth Mother, Birth Father, the purported "legal father," or Grandparents. [Emphasis supplied.]
On August 21, 2002, just two hours before the hearing to terminate parental rights, Birth Mother advised Respondent that she had changed her mind about the adoption. (Bar Exhibit 40) [Emphasis supplied.]
Notwithstanding said attempted withdrawal of consent, the frequent contacts by the Grandparents, and the absence of any contact with the named biological father, Respondent appeared before a Circuit Court Judge, ex parte, and obtained an executed Order Terminating Parental Rights.[9] [Emphasis supplied.] The Order presented by Respondent repeats the untrue implication that there is a "Legal Father."[10] [Emphasis supplied.]
The Order contains two additional falsehoods, either of which would have defeated Respondent's efforts to obtain a signed order. [Emphasis supplied.] Specifically, paragraph 6 and the[11] last sentence of paragraph 7 of the Order are untrue.
*1032 In paragraph 7 Respondent recited, "The biological father is unknown." Nevertheless, precisely to the contrary, on the same day, Respondent sent forms to Mississippi counsel under the heading, "IN RE: BIRTH FATHER CONSENT FORMS." (Bar Exhibit 14 page 2.) Above Respondent's signature, the letter says, "Again, the birthfather's name is. . . ." He had been identified by Birth Mother on "day one." [Emphasis supplied.] Respondent did not cease her efforts to obtain Birth Father's consent because of an opinion that he was not the birth father. She ceased them because, "The maternal grandmother has contacted him . . . trouble is brewing." (Bar Exhibit 14, p. 44) [Emphasis supplied.] The search for the biological father, which did not begin until the date of the termination of parental rights, was nothing more than a sham. (Transcript p. 769, line 7) [Emphasis supplied.]
Respondent acknowledged receiving a letter postmarked August 24, 2002 wherein the Grandparents asserted their claim for priority because the child had lived with them for six months.[12] [Emphasis supplied.]
Notwithstanding the foregoing, on October 17, 2002, Respondent filed a Petition for Adoption, (Bar Exhibit 32), on behalf of her clients, Adoptive Parents. Simultaneously, Respondent attended the adoption hearing with her clients and Baby Z. A Circuit Judge signed[13] the Order for Final Adoption.[14] (Bar Exhibit 33) In meeting with her clients and in her presentation to the Court, the Respondent knew, or should have known, that the adoption proceedings were suspect, if not fatally defective.[15] Nevertheless, Respondent did not inform the Court or Adoptive Parents about any of the problems or potential problems. [Emphasis supplied.]
Subsequent to the adoption, Birth Mother and Grandparents began litigation seeking the return of Baby Z. That litigation was settled; in essence, the Adoptive Parents were forced to settle for an open adoption, giving Birth Mother and Grandparents visitation rights with Baby Z. [Emphasis supplied.]
Adoptive Parents brought a malpractice action against Respondent which has been settled. Adoptive Parents had paid $15,000.00 for the adoption. Of that sum, $1,611.16 was used for out-of-pocket costs. (Bar Exhibit 34B.) Respondent and her carrier returned the entire fee. Respondent *1033 contributed her deductible, $5,000.00, towards the settlement. [Emphasis supplied.]
PARIENTE, J., dissenting.
The message from this Court in both the majority and dissenting opinions is unmistakable and should not only be heard but heeded by all members of The Florida Bar and the publicviolations of the rules of professional conduct that affect children will not be tolerated under any circumstances. Though a lawyer's duty to be truthful to a judge is an essential tenet of an attorney's obligations in any case, the material omission and the false statements of fact in this case involved the fate of a child, which make this lawyer's conduct even more egregious. Although I agree with Chief Justice Lewis that the standards governing lawyer discipline warrant disbarment in these circumstances, I write to emphasize that the three-year suspension imposed by the majority is a very severe sanction. In fact, it is the most serious sanction possible short of disbarment and attests to the fact that this Court unanimously condemns the actions of Ms. Dove.
NOTES
[1] As this case involves the adoption of a child, the identities of certain individuals are confidential.
[2] Before the referee, the parties disagreed as to whether the child resided with its grandparents or with the birth mother and her boyfriend at the time of the social worker's visit and the adoptive placement. The referee stated that he intentionally did not resolve that disagreement because it was Dove's duty to obtain a Uniform Child Custody Jurisdiction Act (UCCJA) affidavit that would have resolved the residence issue in the trial court. Dove failed to file an affidavit establishing the child's residence.
[3] The birth mother provided the social worker with the name of her child's biological father during the initial interview. Dove was aware of this information. On the same day as the termination of parental rights hearing, Dove sent forms to a Mississippi attorney under a heading "IN RE: BIRTH FATHER CONSENT FORMS," in an effort to obtain the biological father's consent or affidavit of nonpaternity in lieu of consent. In that transmission above Dove's signature, the letter states: "Again, the birthfather's name and address [are]...." Furthermore, Dove was aware or should have been aware that section 63.062(1)(d)(3), Florida Statutes (2002), provided that where a birth mother identified "a person she has reason to believe may be the father of the minor in an action to terminate parental rights pending adoption," a petition to terminate parental rights pending adoption may only be granted upon obtaining a written consent to adoption or an affidavit of nonpaternity from that identified person. Dove also was aware or should have been aware of the notice and search requirements relating to any "person whose consent is required" set forth in section 63.088, Florida Statutes (2002). It is significant that Dove did not cease her efforts to obtain the biological father's consent on the basis that he was not in fact the biological father but only later attempted to assert that theory when her false statements were exposed. Rather, Dove ceased her efforts to obtain his consent because, as Dove's communications to the Mississippi attorney stated, the "maternal grandmother has contacted him ... trouble is brewing."

Since this adoption, Florida's adoption law underwent significant legislative reform in 2003. An adoption entity's current statutory obligations relating to locatable biological fathers identified by the birth mother are discussed in Heart of Adoptions, Inc. v. J.A., 963 So.2d 189 (Fla.2007).
[4] At the time of this adoption, certain grandparents were given a statutory priority to adopt. Section 63.0425(1), Florida Statutes (2002), provided as follows:

When a child who has lived with a grandparent for at least 6 months is placed for adoption, the adoption entity handling the adoption shall notify that grandparent of the impending adoption before the petition for adoption is filed. If the grandparent petitions the court to adopt the child, the court shall give first priority for adoption to that grandparent.
Section 63.087(6)(f)(8), Florida Statutes (2002), provided that a petition for termination of parental rights pending adoption must include a "certificate of compliance with the requirements of s. 63.0425 regarding notice to grandparents of an impending adoption."
In 2003, section 63.0425 was revised to provide that adoption entities must give a grandparent notice of the hearing on the petition for termination of parental rights pending adoption when the subject child lived with the grandparent for at least six months within the twenty-four month period immediately preceding the filing of the petition for termination of parental rights pending adoption. Such grandparents are no longer given priority to adopt. See § 63.0425, Fla. Stat. (2003).
[5] Of his own initiative, Spuhler had Dove's rate increased to $60 per hour, a figure he considers still extremely below market rate for her lobbying services.
[6] Dove created the Ukraine Project through Foundation for Children, Inc., after traveling on State business to the Ukraine in 1996 and learning of the country's need for medical supplies and other goods.
[7] Standard 6.11 provides that disbarment is appropriate when a lawyer: "(a) with the intent to deceive the court, knowingly makes a false statement or submits a false document; or (b) improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." Standard 7.1 provides that disbarment is appropriate when a lawyer "intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."
[8] Moreover, the venue requirements of section 63.087(4), Florida Statutes (2002), were not observed in this adoption. The termination of parental rights and adoption hearings were held in a different county than the residence of the birth mother or the prior residence of the child, making it even more likely that the biological family would not attend the hearings.
[9] In his report, the referee failed to explain how he arrived at the $8,388.84 amount.
[10] See Appendix (Report of the Referee  Factual Findings).
[11] In the interests of limiting an already lengthy dissent, I only mention a brief sampling of additional examples of Dove's improper conduct.
[12] Dove admitted before the referee that the maternal Grandparents began contacting her office on the same day on which her agents removed Baby Z (i.e., July 21, 2002). She also stipulated that the baby resided with the Grandparents from the date of his birth on November 26, 2001, and that he resided there for more than six months.
[13] Section 63.0425, Florida Statutes (2002), provides in relevant part:

(1) When a child who has lived with a grandparent for at least 6 months is placed for adoption, the adoption entity handling the adoption shall notify that grandparent of the impending adoption before the petition for adoption is filed. If the grandparent petitions the court to adopt the child, the court shall give first priority for adoption to that grandparent.
(Emphasis supplied.)
Section 39.801(3)(a)(5), Florida Statutes (2002), provides:
(3) Before the court may terminate parental rights, in addition to the other requirements set forth in this part, the following requirements must be met:
(a) Notice of the date, time, and place of the advisory hearing for the petition to terminate parental rights and a copy of the petition must be personally served upon the following persons, specifically notifying them that a petition has been filed:
...
5. Any grandparent entitled to priority for adoption under s. 63.0425.
(Emphasis supplied.)
[14] This case and others of similar import chronologically preceded Dove's flagrant ethical violations in this case. These decisions are available through simple reference to an annotated version of section 63.0425, Florida Statutes. Further, Dove's own family-law expert conceded that Dove could have found such decisions through "nominal research," and that it was Dove's duty to accurately inform the circuit court of the law and facts required to make correct decisions in the underlying termination-of-parental-rights and adoption cases.
[15] Eleanor Flemming, one of Dove's agents in the adoption business, testified that during her first call to secure the child, she inquired where Baby Z was living. The response was "that could be a problem." (Emphasis supplied.) Ms. Flemming further testified that she was aware of the six-month grandparent-adoptive-preference law (section 63.0425), which is why she asked these questions.

Similarly, Deborah O'Reilly, Dove's paralegal for seven years, whom Dove impermissibly and intentionally allowed to fulfill adoption-related duties without having obtained the requisite qualifications, and who actually traveled to Central Florida to remove the child, testified that the Birth Mother informed her "that [Baby Z] stayed at the grandparents' house." (Emphasis supplied.)
[16] It is most distressing that such a financial burden was placed on the shoulders of these good people to merely correct that which should never have occurred and that Dove's conduct only produces a suspension.
[17] For example, the following exchange occurred between Bar counsel and Ms. O'Reilly before the referee:

Q. [W]hen working in Ms. Dove's office, was there a distinction between the law office or the Dove law firm and the adoption agency? A. No, just the sign. Q. Was there a distinction in terms of how things were handled? A. No.... Q. Same door? A. Same door. I worked out of the same office, the same desk.... Q. In your work,... who was your boss? A. Joyce Dove. Q. In doing adoptions, who was your boss? A. Joyce Dove.
Ms. Flemming testified that Dove controlled all aspects of her law firm, her adoption agency, and her foundation  Dove made all of the decisions.
[18] The referee commented that Dove appeared to be representing her own interests in the termination-of-parental-rights and adoption proceedings, which obviously included placing the child and obtaining her fee.
[19] Below, Ms. O'Reilly testified that the adoption documents proffered by Dove bore what was allegedly O'Reilly's notary stamp and signature, but that she did not complete these notarizations and that the signature on these documents did not correspond to her own.
[20] According to employees of Dove, this type of conduct was not unusual and had occurred before.
[21] Dove claims that she has demonstrated a commitment to serving the public, the profession, and the Court through a variety of positive deeds. She argues that these contributions should result in a light sanction. However, this Court has expressly held that good works do not overcome a serious pattern of intentional misconduct. "An attorney does not perform such good works so that they can be used as a credit against such severe misconduct. The public has a right to have confidence that all lawyers who are members of The Florida Bar are deserving of their trust in every transaction." Travis, 765 So.2d at 691; see also Fla. Bar v. Aaron, 606 So.2d 623 (Fla. 1992). Moreover, in a similar misrepresentation case, this Court held that disbarment was the appropriate discipline in spite of the attorney's "significant contributions to the legal community and to various charitable organizations." Rood, 620 So.2d at 1255 (emphasis supplied).
[22] See mitigators (3) and (4) listed above. The egregious nature of Dove's deceit militates against her prior accomplishments or subsequent evidence of interim rehabilitation having an impact on the severity of the sanction involved in this case; this is especially so in light of the severe damage Dove has caused those involved in the adoption case and the legal system. See, e.g., Korones, 752 So.2d at 591-92; Travis, 765 So.2d at 691 (holding that prior commendable acts do not serve as an ethics-credit system to offset later egregious, intentional ethical violations).
[23] The referee would have imposed a public reprimand and a two-year probation for intentionally lying to a circuit court, amongst other violations, and the majority has chosen to only require a suspension notwithstanding the facts of this case, the rule of Dodd, and the guidance of the Standards for Imposing Lawyer Sanctions. See majority op., supra at 1002, 1012.
[24] Fla. Bar v. Martinez-Genova, 959 So.2d 241, 246 (Fla.2007).
[1] In order to do so, the respective legal status or position in the case will be used as though it is the name of the persons involved.
[2] TFB File Nos. 2003-00,282(2A) and 2004-00,519(2A).
[3] TFB File No. 2005-00,001(2A).
[4] The parties hereto disagreed as to whether Baby Z resided with his grandparents or with his birth mother and her boyfriend. Both sides offered substantial testimony. I have intentionally not resolved that disagreement. It was Respondent's duty to obtain a UCCJA Affidavit which would have resolved the residence issue. Respondent failed to obtain or file said affidavit. [Emphasis supplied.]
[5] Emphasis added. There was no "legal father" in this context. I reject Respondent's argument that Boyfriend was even arguably a "Legal Father." [Emphasis supplied.]
[6] The parties hereto disagreed as to when Respondent became aware of Grandparents' statutory claim. I expressly refrain from finding a specific date. I find that Respondent had notice to Grandparents' claim well before Respondent filed the petition for adoption. [Emphasis supplied.]
[7] Nor is there any explanation as to who the "legal father" is or why a "legal father" is involved in the child's life.
[8] Respondent claimed to have prepared a Petition; however, none was located in the Court file or respondent's files.
[9] A Circuit Judge witness in this case testified that Circuit Judges' calendars require them to rely upon counsel to have the files in order. I have treated the Order as having been drafted by Respondent and submitted to the court with some sort of "All's well." statement.
[10] Although no Legal Father was ever identified in the Order, Respondent recites that he: "ha[s] been told that if [he fails] to appear. . ."; "ha[s] been served with notice."; "executed a written consent to adoption"; "executed waiver of venue . . . has no objection to [proceeding in Leon County]"; "wants no further parental rights. . . ."
[11] As to paragraph 6: there was no UCCJA filed. (Thus there was no way that a determination could be made as to claims by other persons.); contrary to § 63.062, F.S. (2001), Respondent failed to obtain and file a consent to adopt form from the biological father even though the surrender is stated in the petition for adoption. (Bar Exhibit 32); contrary to § 63.082(3)(a), F.S. (2001), Respondent failed to obtain and file a family, social and medical history from the biological father; contrary to § 63.082(3)(b), F.S. (2001), Respondent failed to obtain and file an interview, summary, or statement from the biological father; contrary to § 63.082(6), F.S. (2001), Respondent failed to obtain and file the written acknowledgement of receipts of the consent to adopt from each person who executed the Consent to Adoption; contrary to § 63.087(6)(f)(8), F.S. (2001), Respondent failed to file a certificate of compliance with grandparents notification law; contrary to § 63.087, F.S. (2001), Respondent failed to file a Petition for Termination of Parental Rights with the court. [Emphasis supplied.]
[12] See Notes 4 and 6 above. Respondent's concerns about the scrivening of the letter and address are unconvincing when taken in the light of this case as a whole.
[13] See Note 9 above.
[14] Both the Petition for Adoption and the Order for Final Adoption contain the misrepresentation, "the biological father . . . surrendered [his] parental rights. . . ."
[15] Because among other things, 1. The underlying Termination of Parental Rights was defective for the reasons set forth above. 2. The ninety day waiting period had not expired. (I have not researched whether this is a jurisdictional defect; accordingly, I have not placed much weight on this defect.) 3. Respondent had stated in the petition for adoption, among other things, that the biological father had surrendered his parental rights. Said allegation was false. 4. Respondent had not given the Grandparents the statutory notice. Respondent failed to advise the Court that the maternal grandparents were claiming priority adoption rights. 5. Respondent knew that Birth Mother desired that her consent be withdrawn. 6. Respondent knew that Birth Father not only did not consent, but that he objected to the proceedings. [Emphasis supplied.]